IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PHILLIP A. VAVRO,                          )
                                           )
        Plaintiff,                         )
                                           )     Civil Action No. 05-321
                v.                         )
                                           )     Judge David S. Cercone
JAMES W. ALBERS and STANLEY                )     Magistrate Judge Lisa Pupo Lenihan
BERENT,                                    )
                                           )     Doc. No. 66
        Defendants.                        )


## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

**I.      RECOMMENDATION**

It is recommended that Defendants' Joint Motion to Dismiss the Third Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6) be granted and the Third Amended Complaint be dismissed in its entirety with prejudice.

**II.     REPORT**

Currently pending before the Court is Defendants' Joint Motion to Dismiss the Third Amended Complaint. Plaintiff filed his Third Amended Complaint against Defendants James W. Albers and Stanley Berent (hereinafter "Defendants" or "Doctors"),[1] on December 18, 2005, in response to this Court's Report and Recommendation dated October 27, 2007 (Doc. No. 48), adopted by the District Court on November 16, 2005, and granting Plaintiff leave to file a Third Amended

---

[1]Prior to filing his Third Amended Complaint, Plaintiff filed a Motion to Voluntarily Dismiss certain previously named Defendants, *i.e.,* A.K. Steel Co., University of Michigan, University of Michigan School of Medicine, Joint Defense Agreement, John and Mary Does 1-100, and Doe Corporations, Partnerships or other entities 1-100 Doe Defendants, on November 12, 2005 (Doc. No. 50), which was granted on December 13, 2005 (Doc. No. 58). Plaintiff also filed a Notice of Voluntary Dismissal of Defendant Railroad Occupational Intra-Industry Claims Organization ("ROIICO") on January 4, 2006 (Doc. No. 65); ROIICO was terminated as a party-defendant on January 5, 2006.

Complaint to plead sufficient facts to establish this Court's subject matter jurisdiction.  Plaintiff has now pled sufficient facts to establish this Court's subject matter jurisdiction.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a).  Venue lies in this District pursuant to 28 U.S.C. § 1391(a)(2), as Plaintiff alleges in his Third Amended Complaint that a substantial part of the events giving rise to his claims occurred in this District.

In his Third Amended Complaint, Plaintiff seeks damages for the following alleged claims: (1) Defendants' negligent failure to protect his Informed Consent Protections codified at 45 C.F.R. § 46.116(d); (2)  a civil conspiracy to perpetrate a fraud to convert Plaintiff's personal property in the form of Plaintiff's personal medical information ("PMI") in violation of 42 U.S.C. § 1320d-6(b), Health Insurance Portability and Accountability Act of 1996  ("HIPAA"), Section 1177; (3) the unlawful conversion of Plaintiff's personal property in the form of his PMI, in violation of HIPAA; (4) a conspiracy to violate Sections 1962 and 1964(c) of the Racketeering Influenced Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO"); and, (5) Defendants' continued use of Plaintiff's PMI which constitutes a continuing criminal violation of Section 1177 of HIPAA and RICO, 18 U.S.C. §§ 1961 & 1964(c).

In response, Defendants contend that the Third Amended Complaint should  be dismissed with prejudice for failure to state a claim upon which relief can be granted under Fed.R.Civ. P. 12(b)(6).    For the reasons that follow, the Court recommends that Defendants' Joint Motion to Dismiss the Third Amended Complaint be granted with prejudice.

## A.        Standard of Review - Motion to Dismiss

Defendants have moved to dismiss the Third Amended Complaint in its entirety under Rule 12(b)(6).  In ruling on a motion to dismiss under Rule 12(b)(6), the Court is required to accept as true

all allegations made in the complaint and all reasonable inferences that can be drawn therefrom, and to view them in the light most favorable to the plaintiff.[2]  *See Blaw Knox Ret. Income Plan v. White Consol. Indus. Inc.*, 998 F.2d 1185, 1188 (3d Cir. 1993); *Ditri v. Coldwell Banker Residential Affiliates, Inc.*, 954 F.2d 869, 871 (3d Cir. 1992).  The issue is not whether the plaintiff will ultimately prevail, but rather whether "plaintiff can prove any set of facts consistent with the averments of the complaint which would show the plaintiff is entitled to relief."  *See Gaines v. Krawczyk,* 354 F.Supp. 2d 573, 576 (W.D.Pa. 2004) (citing *Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1261 (3d Cir. 1994)).  Dismissal is appropriate "only if it is clear that no relief could be granted under any set of facts that could be proven consistent with the allegations."  *See Port Auth. of New York and New Jersey v. Arcadian Corp.*, 189 F.3d 305, 311 (3d Cir. 1999) (quoting *Alexander v. Whitman*, 114 F.3d 1392, 1397 (3d Cir. 1997)); *see also Conley v. Gibson,* 355 U.S. 41, 45-46  (1957); *Langford v. City of Atlantic City,* 235 F.3d 845, 847 (3d Cir. 2000).  Thus, under this standard, a complaint will withstand a motion to dismiss if it gives the defendant adequate notice of the essential elements of a cause of action.  *Gaines,* 354 F.Supp. 2d at 576 (citing *Nami v. Fauver,* 82 F.3d 63, 66 (3d Cir. 1996)).

Courts generally consider only the allegations of the complaint, attached exhibits, and matters of public record in deciding motions to dismiss.  *Pension Benefit Guar. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).  Factual allegations within documents described or identified

---

[2]Nonetheless, a court is not required to credit bald assertions or legal conclusions in a complaint when deciding a motion to dismiss.  *Gaines v. Krawczyk,* 354 F.Supp. 2d 573, 576 (W.D.Pa. 2004) (citing *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir. 1997)).  Consistently, the courts have rejected "'legal conclusions,' 'unsupported conclusions,' 'unwarranted inferences,' 'unwarranted deductions,' 'footless conclusions of law' or 'sweeping legal conclusions cast in the form of factual allegations'"[,] in deciding a motion to dismiss pursuant to Rule 12(b)(6).  *Id.* (citing *Morse,* 132 F.3d at 906 n. 8 (citing Charles Allen Wright & Arthur R. Miller, *Federal Practice and Procedure,* § 1357 (2d ed. 1997)); *Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir. 1996); *Fernandez-Montes v. Allied Pilots Ass'n,* 987 F.2d 278, 284 (5th Cir. 1993)).

in the complaint may also be considered if the plaintiff's claims are based upon those documents. *Id.* (citations omitted).  A district court may consider these documents without converting a motion to dismiss into a motion for summary judgment.  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

### B.    Statement of Facts and Procedural History

Plaintiff claims to suffer from toxic solvent encephalopathy ("TSE") attributable to alleged chronic and uncontrolled exposure to chlorinated solvents while working for A.K Steel Corporation in Butler, Pennsylvania. (Third Amended Complaint (hereinafter "TAC"), ¶ 49.)  Plaintiff contends his TSE caused his total disability from gainful employment.  (TAC ¶ 51.)  Plaintiff filed a claim for workers' compensation occupational disease ("WCOD") benefits related to his TSE, which was contested by A.K. Steel, and subsequently denied by a Workers' Compensation Administrative Law Judge (hereinafter "WC-ALJ").  (TAC, ¶¶ 52-53; Ex. 2 to Pl.'s Answer to Defs.' Joint Mot. to Dismiss TAC (Doc. 73-3).)   The decision of the WC-ALJ was affirmed by the Workers' Compensation Appeal Board ("WCAB") and the Commonwealth Court of Pennsylvania. (Ex. 4 and Ex. 5 to Pl.'s Answer to Defs.' Joint Mot. to Dismiss TAC (Doc. 73-5 & 73-6).)  Plaintiff also applied for short-term and long-term disability retirement benefits ("disability retirement benefits"), but this claim was also denied.[3]

---

[3]There is no indication in the Third Amended Complaint or elsewhere in the record of the basis or nature of Plaintiff's disability retirement claim, when it was made, denied, the outcome and bases therefor, or whether an appeal was taken and/or administrative remedies exhausted.  Plaintiff has failed to plead any facts to show that the denial of his statutory right to short-term and long-term disability retirement benefits is properly before this Court. Moreover, in all likelihood, the denial of disability retirement benefits is governed exclusively by ERISA. Therefore, to the extent any of Plaintiff's claims includes an allegation of injury and/or damages predicated on the denial of his "statutory right to short-term and long-term disability retirement benefits," the Court will disregard such allegations and recommends all such references/allegations be stricken/dismissed from the Third Amended Complaint.

The thrust of Plaintiff's complaint before this Court is that Defendants conspired to and did, in fact, conduct fraudulent defense medical examinations ("DMEs") of Plaintiff for the purpose of obtaining Plaintiff's PMI and converting it for their use without authorization, by publishing his PMI in three biomedical journal articles[4] and using these journal articles to successfully defend the TSE claims of Plaintiff and other railroad workers.[5]   Plaintiff thus contends that Defendants' conduct constitutes fraud, conversion of personal property and a civil conspiracy under Pennsylvania law, a conspiracy to violate RICO, and violations of 42 U.S.C. § 1320d-6(b), Section 1177 of HIPAA, which constitutes a violation of RICO. (TAC ¶ 48.)  In addition, Plaintiff contends Defendants were negligent in that they had a duty to protect Plaintiff's PMI and they breached that duty in failing to either inform Plaintiff of his informed consent protections (codified at 45 C.F.R. § 46.116(d)(1)-(4)) and/or obtaining an effective waiver of said protections, or by failing to document the elements of an effective waiver.  (TAC ¶¶ 64-68.)

_____

[4]The articles to which Plaintiff is referring were published in the JOURNAL OF OCCUPATIONAL & ENVIRONMENTAL MEDICINE ("JOEM") in June of 1999 and 2000, and were authored by a number of medical doctors and/or PhDs, including the Defendants. (Ex. 10 and Ex. 11 to Pl.'s Mot. for More Definite Statement, and Mot. to Strike   (Doc. 27-2, pgs. 17-22).)  Plaintiff also refers to a third JOEM article, but the Court is unable to determine the title, authors or date of that article from the record.

[5]By way of further background, Plaintiff alleges that ROIICO, an *ad hoc* committee of the Association of American Railroads ("AAR") which was formed in 1996 allegedly in response to a position statement approved by a majority of the invitees at a workshop hosted by the National Institute of Occupational Safety and Health ("NIOSH") in November, 1996, conspired with its counsel and the Defendants to set up and conduct fraudulent DMEs.  (TAC ¶¶ 10, 23-24, 27, 36, 47.)  The NIOSH position statement found, in effect, that TSE is an occupational disease which required human research to measure the incidence of TSE in various occupations and to identify dispositive TSE-diagnostic techniques and treatment.  (TAC ¶ 14.) According to Plaintiff, the purpose of the fraudulent DMEs was to examine TSE-claimants, to obtain and distort their PMI, which was protected by 42 U.S.C. § 1320d-6(b), to counter the NIOSH research, to convert said PMI for ROIICO's use by publishing said PMI as "human research" in three biomedical publications, which either denied the existence of TSE or posited that TSE-patients were misdiagnosed psychiatric patients.  (TAC ¶¶  37, 47, 56.)
Defendants maintain that Plaintiff fails to recognize that the human research that formed the basis of the JOEM articles involved only railroad workers.  Indeed, Defendants argue that they had not even met Plaintiff at the time the first JOEM article was published in June of 1999, as the DMEs of Plaintiff did not occur until September 7 and 8, 1999.  (Defs.' Reply to Pl.'s Answer to Joint Mot. to Dismiss TAC (Doc. 71) at 3 & n.3 (citing Mot. to Strike, Ex. 10; Mot. to Dismiss SAC, Ex. 1 at 8 & 9).)

Plaintiff further contends that when he became aware of the alleged conspiracy between Defendants and ROIICO, he filed a complaint with the Department of Health and Human Services Office for Human Research Protections ("OHRP") regarding Defendants' alleged conversion and publication of his PMI.[6]  (TAC ¶ 57.)  According to Plaintiff, OHRP investigated Plaintiff's complaint and on or about February 12, 2003, issued a determination letter in which it found Defendants' use of Plaintiff's PMI in violation of the informed consent protections codified at 45 C.F.R. § 46.116(d)(1)-(4).[7]  (TAC ¶ 59.)  However,  the February 12, 2003 correspondence from OHRP does not make any such finding,[8] but rather, states that the identified research activity[9] was submitted to the University of Michigan institutional review board ("IRB") for review and the IRB subsequently approved a waiver of the requirement for informed consent for all research involving retrospective review of medical records for each of the studies.  (Ex.10 to Pl.'s Answer to Defs.'

---

[6]Plaintiff's complaint was made in a letter dated March 15, 2001 addressed to OHRP.  *See* Ex. 20 to Pl.'s Mot. for More Definite Statement, and Mot. to Strike Defs.' Mot. to Dismiss (Doc. 27-3, pgs. 14-15).

[7]Plaintiff contends he learned of OHRP's February 12, 2003 determination on March 16, 2003.  (TAC ¶ 61.)  By making this allegation, Plaintiff appears to be attempting to establish the date he "discovered" his injuries, thereby establishing that his state common law claims were timely filed.  In other words, Plaintiff is attempting to show that the statute of limitations did not begin to run until March 16, 2003, when he learned of OHRP's findings.  However, as discussed below, the proper inquiry is when a reasonable person in Plaintiff's position would have known of his injuries, and Plaintiff's letter dated March 15, 2001 to OHRP indicates that he knew all of the facts of his injuries by March 15, 2001.

[8]The Court is not required to accept as true allegations of fact that are obviously untrue, or that obviously cannot be proven.  *See* note 2, *supra*.  Moreover, the Court may consider the factual allegations contained in the February 12, 2003 letter from OHRP without converting Defendants' motion to dismiss to a summary judgment motion, because Plaintiff has described or identified this letter in the Third Amended Complaint and some or all of his claims are based on this document.  *Burlington,* 114 F.3d at 1426.

[9]OHRP investigated the following research activity of the Defendants: Albers, J.W., *et al.*, *Absence of Polyneuropathy Among Workers Previously Diagnosed with Solvent-Induced Toxic Encephalopathy,* JOURNAL OF OCCUPATIONAL & ENVIRONMENTAL MEDICINE, 41:500-509 (1999); and Albers, J.W. *et al., Neurological Evaluation of Workers Previously Diagnosed with Solvent-Induced Toxic Encephalopathy,* JOURNAL OF OCCUPATIONAL & ENVIRONMENTAL MEDICINE, 42:410-423 (2000).  (Ex.10 to Pl.'s Answer to Defs.' Joint Mot. to Dismiss TAC (Doc. Nos. 70-11 & 73-11).)

Joint Mot. to Dismiss TAC (Doc. Nos. 70-11 & 73-11).)  OHRP then determined that the University

of Michigan IRB failed to document the four specific criteria for waiver of informed consent for the

identified research activity as required by 45 C.F.R. § 46.116(d).  (*Id.*)  OHRP directed the

University of Michigan to submit a satisfactory corrective action plan  addressing this finding by

March 31, 2003.  (*Id.*)  It appears that the IRB's failure to document the four criteria for waiver was

ultimately resolved to the satisfaction of OHRP as of September 15, 2003.  *See Wicker v.*

*Consolidated Rail Corp.,* 371 F. Supp. 2d 702, 705-06 (W.D. Pa. 2005).

As to damages, Plaintiff avers that as a result of Defendants' negligence, he was denied his

statutory right to WCOD and disability retirement benefits.  (TAC ¶ 69.)  He requests compensatory

damages equal to the amount he would have received in WCOD and disability retirement benefits,[10]

estimated to be $980,000.00, as well as costs for health care necessary to treat TSE over his lifetime,

estimated to be in excess of $ 3 million.  (TAC ¶ 70.)  In addition, as a result of Defendants' civil

conspiracy and fraud,[11] Plaintiff claims he was denied his statutory right to the health care necessary

to treat TSE as provided by the Pennsylvania Workers' Compensation Act ("WCA").  (TAC ¶¶ 78,

83.)  Plaintiff requests punitive damages in an amount equal to the amount he would have received

in WCOD and disability retirement benefits,[12] plus the cost of health care necessary to treat TSE over

his lifetime.  (TAC ¶¶ 79, 84.)

Plaintiff also claims actual damages resulting from Defendants' conversion of his PMI in the

---

[10]*See* note 3, *supra*.

[11]With regard to the fraud claim, Plaintiff also contends that by operation of the fraud, Defendants
obstructed his statutory right to WCOD and disability retirement benefits.  (TAC ¶ 83.)

[12]*See* note 3, *supra*.

form of the loss of his statutory right to WCOD and disability retirement benefits,[13] and punitive damages.  (TAC ¶¶ 89-90.)  He requests punitive damages in an amount equal to what he would have received in WCOD and disability retirement benefits[14] and the cost of continuing health care to treat TSE over his lifetime.  (TAC ¶ 92.)

As to his claim for conspiracy to violate RICO, Plaintiff requests punitive damages in an amount "treble the *quantum meruit* penalty value of the railroads and AAR who formed ROIICO," and treble the equivalent of the amount of WCOD and disability retirement benefits[15] he was entitled to receive, plus the costs of continuing health care over his lifetime.  (TAC ¶ 98.)  As to his claim against Defendants for violations of RICO, Plaintiff contends as a result of Defendants' actions, he suffered serious personal and financial injuries, including "intentionally inflicted distress, some or all of which may be permanent;" "physical pain and mental distress;" "diminished capacity to enjoy life;" "sustained loss of income, a diminished earning capacity, and other substantial economic losses".  (TAC ¶ 106.)  Plaintiff further contends he was wrongfully and intentionally denied treatment and care, and will continue to incur bills for such treatment and care in the future.  (*Id.*)  Further, as a "direct result of defendants' fraud, conversion and organized crime conduct[, Plaintiff contends Defendants] committed the independent tort of intentional infliction of emotional distress." (*Id.*)  Finally, as to all claims, Plaintiff requests pre-judgment interest, his costs of suit, injunctive relief against Defendants, costs, and legal or attorney's fees.  (TAC ¶ 107.)

In response to Plaintiff's Third Amended Complaint, Defendants have filed a Joint Motion

---

[13]*Id.*

[14]*Id.*

[15]*Id.*

to Dismiss said Complaint in its entirety.  In opposition, Plaintiff has filed an Answer to Defendants'

Joint Motion to Dismiss the Third Amended Complaint (hereinafter "Answering Brief"), maintaining

that he has sufficiently pleaded state law claims of negligence, conversion, fraud and conspiracy, as

well as a federal civil RICO violation.  Defendants filed a Reply Brief in response to Plaintiff's

Answering Brief.  Accordingly, Defendants' Joint Motion to Dismiss the Third Amended Complaint

is now ripe for determination.

**C.      Analysis**

At the outset, the Court is compelled to make two observations regarding this litigation.  First

and foremost, it appears that the present lawsuit is nothing more than an attempt by Plaintiff to

relitigate his failed claims for WCOD and disability retirement benefits, albeit under the guise of

state common law tort and civil RICO claims.  Plaintiff alleges essentially the same injuries, and

claims as damages the same amounts he would have received if his claims for WCOD and disability

retirement benefits had not been denied.  Principles of collateral estoppel, judicial comity and

economy, and federal preemption (as to disability retirement benefits only[16]), among others, counsel

against allowing Plaintiff to proceed on his claims in this forum.

In addition, Plaintiff makes several allegations in his Third Amended Complaint and

Answering Brief regarding Defendants' wrongful conduct vis a vis railroad workers who brought

unsuccessful claims against their railroad-employers under FELA alleging TSE from exposure to

chemical solvents while employed with the railroads (hereinafter "TSE claimants").  However, the

TSE claimants are not parties to this action; nor is this case a class action. Further, Plaintiff has not

alleged any facts to establish that he even has standing to make these arguments on behalf of the TSE

---

[16]*See* note 3, *supra*.

claimants.  Therefore, the Court finds Plaintiff may not assert injuries and damages on behalf of any of the TSE claimants in the present litigation.

### 1.   Statute of Limitations Bars Plaintiff's State Law Claims of Negligence, Conversion, Fraud, and Conspiracy

Defendants raise an argument, in the alternative, which the Court feels should be addressed at the outset, namely, that Plaintiff's state common law tort claims (hereinafter "tort claims") are barred by the applicable statute of limitations under Pennsylvania law, and therefore, should be dismissed.   In particular, Defendants maintain that Plaintiff's tort claims are subject to Pennsylvania's  two-year statute of limitations,[17] and that the Court need only look to the decisions of the WC-ALJ, WCAB, and Commonwealth Court in the workers' compensation proceedings to see that Plaintiff was aware of his alleged injuries more than two years prior to the commencement of the instant lawsuit on March 10, 2005.  In response, Plaintiff submits that he was not aware of the facts related to his loss of statutory entitlement to WCOD and disability retirement benefits until on or about March 16, 2003, as supported by his Affidavit attached to his Answering Brief (Doc. No. 70-12).  In addition, Plaintiff argues in his Answering Brief that the conversion/theft of his PMI and his conspiracy claims are continuing violations and therefore the statute of limitations does not begin to run until after the commission of the last act.  The Court agrees with Defendants that as to Plaintiff's tort claims, the statute of limitations expired before Plaintiff instituted the present action.

Generally, a statute of limitations begins to run as soon as the underlying cause of action

---

[17]The parties appear to be in agreement that Plaintiff's common law tort claims are subject to Pennsylvania's two year statute of limitations.  Where a federal court exercises diversity jurisdiction, it is required to apply the substantive law of the forum state, which includes statutes of limitations.  *Menchini v. Grant,* 995 F.2d 1224, 1228 n. 2 (3d Cir. 1993) (citing *Ciccarelli v. Carey Canadian Mines, Ltd.,* 757 F.2d 548, 552 (3d Cir. 1985)). The applicable Pennsylvania statutes of limitations for claims arising out of tortious conduct are codified at 42 Pa.C.S.A. § 5524 (West Supp. 2005).

accrues.  Further, "lack of knowledge, mistake or misunderstanding do not toll the running of the

statute of limitations."  *Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc.,* 503 Pa. 80, 85, 468

A.2d 468, 471 (1983).    An equitable exception to this general rule is the discovery rule.[18]

*Menichini v. Grant,* 995 F.2d 1224, 1229 n. 4 (3d Cir. 1993) (citing *Bohus v. Beloff,* 950 F.2d 919,

924 (3d Cir. 1991)). With regard to the discovery rule exception, the Court of Appeals has stated:

> The discovery rule, which "arises from the inability of the injured,
> despite the exercise of due diligence, to know of the injury or its
> cause," [*Pocono Int'l Raceway,* 503 Pa. at 85, 468 A.2d at 471],
> provides that "the statute of limitations begins to run as soon as 'the
> plaintiff knows, or reasonably should know, (1) that he has been
> injured, and (2) that his injury has been caused by another party's
> conduct.'" *Bohus,* 950 F.2d at 924 (citing *Cathcart v. Keene Indus.
> Insulation,* 324 Pa.Super. 123, 136-37, 471 A.2d 493, 500 (1984) (en
> banc)) (footnote omitted).

*Id.*

The Third Amended Complaint and documents identified therein, as well as the decisions

of the Pennsylvania WC-ALJ and appellate tribunals, show unequivocally that as of  March 15,

2001, Plaintiff was aware of Defendants' alleged misuse of his PMI by Defendants, as evidenced by

---

[18]Equitable tolling, which presumes claim accrual, is invoked to toll or stop the running of the statute of limitations in light of established equitable considerations, *Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1390 (3d Cir. 1994), such as where a defendant actively conceals or misleads the plaintiff from discovering the facts of his or her injury.  If raised, equitable tolling will preclude the granting of a motion to dismiss because it raises questions of fact which cannot be determined on a motion to dismiss.  *Id.* at 1391 n. 1.  The Court of Appeals in *Oshiver* cautioned against confusing equitable tolling with the discovery rule in applying statutes of limitations, opining: "The purpose of the discovery rule is to determine the accrual date of a claim, for ultimate purposes of determining, as a legal matter, when the statute of limitations begins to run.  Equitable tolling . . . presumes claim accrual."  *Id.*  Plaintiff has not advanced an equitable tolling argument in this case, nor has he pled any facts in support of equitable tolling, to stop the running of the statute of limitations.  Rather, Plaintiff argues that the discovery rule applies to extend the date of accrual.  Determining the date of accrual of a cause of action is a legal matter that can be determined in a motion to dismiss.  *Kingston Coal Co. v. Felton Min. Co., Inc.,* 456 Pa.Super. 270, 279, 690 A.2d 284, 289 (1997) (citing *E.J.M. v. Archdiocese of Philadelphia*, 424 Pa.Super. 449, 455, 622 A.2d 1388, 1391) (1993) ("where the facts are so clear that reasonable minds cannot differ as to whether the plaintiff should reasonably be aware that he has suffered an injury, the determination as to when the limitations period commences may be made as a matter of law.")).  Therefore, the Court is not precluded from determining whether the statute of limitations bars Plaintiff's tort claims.

his correspondence to the OHRP on that date.  (Ex. 20 to Pl.'s Mot. To Strike (Doc. No. 27-3).)[19]

Moreover, in his March 15, 2001 correspondence to OHRP, Plaintiff states that he "learned" that

Defendants used the articles that they published in the JOEM as the basis for their opinion that he

did not suffer from TSE, and that said opinion caused the WC-ALJ to deny him benefits.  (*Id.*)  It

is also clear from the decisions of the WCAB and Commonwealth Court dated January 22, 2002 and

August 2, 2002, respectively, that Plaintiff was aware of his injuries from Defendants' alleged fraud,

deceit, and theft/conversion of his PMI, as he raised these issues before these appellate tribunals.

Thus, even under the discovery rule exception, Plaintiff's fraud and theft/conversion claims are

untimely.

Plaintiff's negligence claim is likewise untimely because he bases his claim for damages from

Defendants' alleged negligence on the same wrongful conduct underlying his other tort

claims–misuse of his PMI resulting in the denial of his claim for WCOD benefits.  Thus, Plaintiff

was aware of his injury and Defendants' alleged role therein as of March 15, 2001.  Plaintiff's

argument to the contrary is of no avail.  Plaintiff submits that until he learned of the OHRP's

findings as stated in the February 12, 2003 correspondence, he possessed only a "suspicion" that

Defendants' failed to obtain his informed consent to use his PMI in their articles regarding solvent-

induced encephalopathy.  The fact that OHRP investigated the University of Michigan IRB informed

---

[19]The Court may consider factual allegations contained in the March 15, 2001 correspondence to the OHRP because Plaintiff identified this correspondence in his Third Amended Complaint, and his negligence and conversion claims are based on this letter as well as OHRP's letter dated February 12, 2003.  *Pension Benefit Guar.,* 998 F.2d at 1196.  However, the Court declines to consider Plaintiff's Affidavit (Doc. No. 70-12) proffered in support of his "discovery" of Defendants' conduct which he claims gave rise to the instant action, because for purposes of deciding a statute of limitations argument in a motion to dismiss, the Court may only look to the allegations in the complaint or documents identified in the complaint.  *Bethel v. Jendoco Constr. Corp.,* 570 F.2d 1168, 1174 (3d Cir. 1978) (if it is not apparent on the face of the complaint that the action is barred by a statute of limitations, than that defense may not provide the basis for dismissal of the claim under Rule 12(b)(6)).

consent procedure as a result of Plaintiff's March 15, 2001 correspondence and notified the University of Michigan of its findings on February 12, 2003, does not impact this Court's determination of *when* Plaintiff's cause of action for negligence began to accrue. First, nowhere in OHRP's February 12, 2003 correspondence does OHRP state that Defendants failed to obtain Plaintiff's informed consent to use his PMI in their research studies. Rather, OHRP merely found that the University of Michigan IRB approved a waiver of the requirement for informed consent for all research involving retrospective review of medical records for each of the studies, and that the IRB failed to *document* the specific criteria for waiver of informed consent for these research studies, as required by 45 C.F.R. § 46.116(d). These findings do not provide Plaintiff with any more information than he already possessed prior to the issuance of the letter. Accordingly, Plaintiff's reliance on the February 12, 2003 OHRP letter to support his "suspicion" argument is misplaced.

Nor can Plaintiff avoid Defendants' statute of limitations defense by artful pleading, *i.e.,* choosing to refer to his knowledge of Defendants' failure to obtain his informed consent to use his PMI as merely a "suspicion" prior to learning of OHRP's findings in its February 12, 2003 correspondence. The standard applied in determining when a cause of action begins to accrue does not speak in terms of "suspicions." Instead, the standard requires only that Plaintiff be aware of his actual injury; it is not necessary that he be aware of the legal cause of his injury. *Bohus,* 950 F.2d at 924-25 (construing Pennsylvania law) (it is not necessary for Plaintiff to know the exact cause of his injury, or that the injury resulted from another's negligent conduct, or that he has a cause of action, before the statute of limitations will begin to run). Here it is clear from Plaintiff's March 15, 2001 correspondence to OHRP that he possessed an awareness of his actual injury, which is all that is required to start the running of the statute of limitations.

13

Therefore, the Court finds the Third Amended Complaint and documents referenced therein do not support Plaintiff's argument that he was not aware of his injury or Defendants' role in allegedly causing that injury until March 16, 2003. Thus, Plaintiff's negligence claim is barred by the statute of limitations.

As to the timeliness of Plaintiff's state common law conspiracy claim, Plaintiff contends that the statute of limitations does not begin to run until after the commission of the last act in the conspiracy. In the Third Amended Complaint, Plaintiff avers that the Defendants committed the following acts in furtherance of their civil conspiracy:

> (1)   accepting payment from the ROICO to obtain and to convert by criminal means and methods Plaintiff's PMI;
> (2)   by inducing by fraud Plaintiff to under go a fraudulent DME conducted by Defendants . . . ;
> (3)   by obtaining and distorting the results of said DME which was Plaintiff's personal property in the form of his PMI at the conclusion of said DME;
> (4)   by converting said PMI for publication in biomedical articles which countered NIOSH's TSE-Position;
> (5)   by publishing said PMI in their *JOEM* articles for use by the railroads in defense of TSE-claims and
> (6)   by testifying against Plaintiff during Plaintiff's Workers Compensation proceeding and Short - and Long-Term Disability Retirement Arbitrations.

Pl.'s TAC, ¶ 76. In addition, Plaintiff avers that the "actual legal damages which arose consequent to the civil conspiracy . . . is [sic] the denial of [his] statutory right to Workers Compensation benefits and Short- and Long-term Disability Retirement benefits." Pl.'s TAC, ¶ 77. It is clear from the allegations in paragraphs 76 and 77 of the Third Amended Complaint, and the decisions of the WC-ALJ, WCAB and Commonwealth Court, that the acts allegedly committed in furtherance of the civil conspiracy occurred, at the latest, by the date of the WC-ALJ issued his decision denying

14

Plaintiff's claim for WCOD benefits, *i.e.,* December 7, 2000.  Therefore, since Plaintiff did not file his civil conspiracy claim until March 10, 2005, more than four years after the last act in furtherance of the conspiracy, his claim for civil conspiracy is also untimely.

As to the continuing violation doctrine, Plaintiff raises this argument in his Answering Brief only with respect to his conversion/theft claim and his federal RICO claim.  However, the Third Amended Complaint does not contain any allegations of a continuing violation as to Plaintiff's negligence, fraud, conversion or civil conspiracy claims.[20]  Therefore, because Plaintiff has failed to allege a continuing violation as to any of his claims, the Court finds that Plaintiff's tort claims are untimely and therefore Defendants' Motion to Dismiss should be granted as to these claims.

### 2.   Proximate Causation and Collateral Estoppel

Defendants argue that proximate cause is a requisite element of Plaintiff's claims for negligence, fraud and violations of RICO, and that the allegations in the Third Amended Complaint are insufficient to establish proximate cause.  Indeed, Defendants argue Plaintiff's allegation, that Defendants' wrongful conduct resulted in the denial of his WCOD and disability retirement benefits, amounts to sheer speculation.  Defendants thus submit that since Plaintiff cannot prove that their alleged wrongful conduct resulted in a denial of his WCOD and disability retirement benefits, Plaintiff has  failed to state a claim upon which relief can be granted as to his negligence, fraud and

---

[20]A close reading of Plaintiff's Third Amended Complaint reveals that he has pled a continuing violation only as to the criminal conduct that he alleges supports his claim for violation of Sections 1962 and 1964 of RICO. (TAC ¶104, subsections a, h, & i.)   Arguably, even if Plaintiff's allegations of a continuing violation as to his RICO claim could be construed to extend to his state tort claims for conversion and civil conspiracy, which the Court declines to find, the facts alleged in the Third Amended Complaint do not establish a continuing conversion/theft of his PMI or a continuing conspiracy to steal/convert his PMI.  To the contrary, the factual allegations in the Third Amended Complaint show that the sole basis for Plaintiff's claim for damages as to his conversion claim (TAC ¶¶ 89-92) and civil conspiracy claim (¶¶ 76-79) is a single act–the denial of his claim for WCOD, the facts of which were known at the latest on March 15, 2001.  Accordingly, the Court finds no basis for invoking the continuing violation doctrine to any of Plaintiff's state tort claims.

RICO violation claims.  Defendants further submit that Plaintiff is collaterally estopped from litigating the issue of whether Defendants' alleged wrongful conduct resulted in the denial of his WCOD and disability retirement benefits.

The Court finds some merit in Defendants' arguments.  Neither the WC-ALJ nor any state appellate tribunal indicated that the JOEM articles or the underlying research studies on which Plaintiff hangs his hat, played any role in the decision to deny benefits.[21]  Rather, the decision to deny benefits was based on the totality of the evidence and credibility determinations of the WC-ALJ, which included Plaintiff's testimony, as well as the testimony of a certified industrial hygienist, Lawrence Keller; a manager/maintenance engineer for A.K. Steel, Robert E. Cockroff; a maintenance supervisor/repairman for A.K. Steel, Thomas P. Kennedy; expert testimony of Defendant James W. Albers, M.D., Ph.D. (Defendant herein), board certified in neurology and electrodiagnostic medicine; expert testimony of  Stanley Berent, Ph.D. (Defendant herein), board-certified in clinical psychology and clinical neuropsychology; expert testimony of Lisa Ann Morrow, Ph.D., a licensed psychologist; and the expert testimony of Aileen Scott, M.D., board-certified in occupational medicine.  (Decision of WC-ALJ dated 12/7/00 at 10-11 (Ex. 2 to Pl.'s Answer to Defs.' Joint Mot. to Dismiss TAC (Doc. Nos. 70-3 and 73-3).)  In particular, the WC-ALJ accepted as credible the testimonies of Kennedy, Cockroft, Keller, and Doctors Albers and Berent (Defendants herein), and specifically rejected any testimony of the Plaintiff and/or Doctors Morrow or Scott that

---

[21]The only reference to any "studies"  in the WC-ALJ's decision appears as part of the background information provided regarding Dr. Albers credentials: The WC-ALJ noted that Dr. Albers participated in a study that was funded by NIOSH in the early 1980's involving the neurological effects of solvent exposures, and that he participated in subsequent investigations and studies involving the effects of solvent exposure on an individual's neurological well-being. (*Id.* at 8.)  Nowhere in the WC-ALJ's decision does he find that his credibility determinations of Defendants were based on the JOEM articles or the underlying studies.  Likewise, the WCAB and Commonwealth Court affirmances of the WC-ALJ's decision do not turn on any findings in the "studies" or JOEM articles.

contradicted the accepted testimonies, and explained the bases for accepting the evidence.[22]  (*Id.* at 10.)

On appeal, the WCAB and Commonwealth Court rejected Plaintiff's argument that his employer used the "Dow Defense" to obtain a judgment in its favor from the WC-ALJ by fraud and deceit.  (WCAB Op. at 7; Commw. Ct. Op. at 8 & n.15, 10.)  The WCAB dismissed Plaintiff's argument as "an attempt to usurp the [Workers' Compensation Judge's] sole authority to make credibility determinations."   (WCAB Op. at 7.)  The Commonwealth Court affirmed the decision of the WCAB denying Plaintiff's request for remand to the WC-ALJ for rehearing.  In so doing, the Commonwealth Court found that the decision of the WCAB did not violate Section  425 of the WCA, which provides, in pertinent part: "If on appeal  it appears that the [WC-ALJ's] award or disallowance of compensation was capricious or caused by fraud, coercion, or other improper

---

[22]Based on the testimony of Mr. Keller, the WC-ALJ found that although Plaintiff may have had some short periods of peak exposure to solvents in excess of the permissible levels, this exposure was minimal and occurred in areas where a large volume of air was present thus allowing for evaporation and prevention of concentration, and therefore, could not be expected to cause an occupational disease.  (Decision of WC-ALJ dated 12/7/00 at 11 (Ex. 2 to Pl.'s Answer to Defs.' Joint Mot. to Dismiss TAC (Doc. Nos. 70-3 and 73-3).)  The WC-ALJ also accepted as credible the testimony of Kennedy and Cockroft as to Plaintiff's occupational exposure.  (*Id.*)  The WC-ALJ further found significant the fact that Dr. Albers' examination of Plaintiff yielded no neurological symptoms, complaints or neurological signs attributable to exposure to organic solvents, and that the neurological exam of Plaintiff was completely normal, while the majority of problems reported by Plaintiff had a psychological basis.  (*Id.*)  In this regard, Dr. Albers found significant Plaintiff's complaint that his depression was most severe at a time after his exposure to the occupational solvents *terminated,* because there is no evidence of a delayed symptom with exposure to solvents followed by delayed period of time of onset of a problem; rather, according to Dr. Albers, the studies showed improvement after removal from exposure.  (*Id.* at 9.)  (Emphasis added.)  In addition, during Dr. Albers' examination, Plaintiff complained of depression and anxiety of a duration of approximately seven to 10 years; however, Dr. Albers found Plaintiff's statements to be contradicted by his medical records which showed the onset of obsessive-compulsive disorder symptoms to the mid-1970's or mid-1980's, as well as by Plaintiff's previous statements to physicians that he has been depressed his entire life.  (*Id.* at 8.)  The WC-ALJ also found credible Dr. Berent's opinion that although he found Plaintiff had a relatively severe emotional disturbance, he had a long history of psychiatric disturbance dating back many years.  Moreover, Dr. Berent noted that Plaintiff's scores on several cognitive tests were so low that there should have been some demonstrable neurological impairment accompanying the poor performance which did not exist.  (*Id.* at 9-10.)  Also, Dr. Berent's examination revealed that Plaintiff's scores on tests that required memory were inconsistent.  (*Id.* at 10.)  Thus, the WC-ALJ found the opinion testimony of Dr. Berent, that although Plaintiff has a severe emotional disturbance, there is no evidence that toxins played any role and that Plaintiff does not have a solvent-induced disorder, to be credible.  (*Id.* at 11.)

conduct by any party in interest, the [WCAB] may, grant a de novo hearing before the board, or one or more of its members or remand the case for rehearing to any [WC-ALJ]." (Commw. Ct. Op. at 9 (citing 77 P.S. § 856).) Noting unequivocally that the WCAB is vested with sole discretion to grant or deny a rehearing, and such discretion is usually exercised to grant rehearing only to allow a party to present newly discovered, non-cumulative evidence, and not to permit a party to strengthen weak proofs already presented, the Commonwealth Court determined that the evidence on which Plaintiff sought rehearing–Defendants' participation in the CSX study–could not constitute newly discovered evidence. The Commonwealth Court reasoned that Plaintiff's original counsel was aware of the prior and ongoing studies during the proceedings before the WC-ALJ, and extensive voir dire examination was conducted by counsel concerning such studies at the Defendants' depositions in the workers' compensation case. Thus, the Commonwealth Court found that Plaintiff "was merely seeking the proverbial second bit at the apple or, as the [WCAB] so characterized, merely making another 'attempt to usurp the WCJ's authority to make credibility determinations,' which were in [the] Employer's favor." (Commw. Ct. Op. at 10 (quoting WCAB Op. at 7.)[23]

Now, in this federal action, Plaintiff is, in effect, seeking yet another bite at the proverbial apple. As this Court views it, the gist of Plaintiff's claims is that but for the JOEM articles and the underlying studies of Doctors Albers and Berent (which are allegedly based on Plaintiff's converted and/or fraudulently obtained PMI), the WC-ALJ would have awarded benefits to him.

As explained above, however, the issue of whether Defendants' alleged fraudulent and/or

---

[23]The Court also takes judicial notice of the decision of Judge Shaffer in Butler County Court of Common Pleas in which he found Plaintiff was collaterally estopped from proving causation in products liability action against the manufacturers of the chemical solvents which allegedly caused his TSE. *See Vavro v. E+E(US) Inc., t/d/b/a Chemply,* A.D. No. 99-10526, slip op. at 3 (Butler Co. Ct. Com. Pl. Jan. 18, 2002) (Doc. No. 26-2).

deceitful conduct caused the WC-ALJ to issue an unfavorable decision, has already been determined by the WC-ALJ and appellate tribunals to Plaintiff's detriment.  Unhappy with this decision and because he has exhausted all of his workers' compensation appeals, Plaintiff now attempts an end run around the final decision of the state tribunals denying WCOD benefits by instituting the instant lawsuit. This he cannot do.

In order to invoke collateral estoppel, four factors must be demonstrated: (1) identical issues; (2) a final judgment on the merits; (3) party against whom collateral estoppel is invoked was a party or in privity with the party to the prior adjudication; and (4) a full and fair opportunity to litigate the issue in question in the prior action.  *Greenleaf v. Garlock, Inc.,* 174 F.3d 352, 357-58 (3d Cir. 1999) (citations omitted); *Tucker v.  Philadelphia Daily News,* 577 Pa. 598, 848 A.2d 113 (2004).  There is no question here that all four requirements have been met.  The issues are identical, as illustrated by the Court's discussion above.  In addition, the WC-ALJ's denial of WCOD benefits was affirmed by both the WCAB and the Commonwealth Court of Pennsylvania, and the Pennsylvania Supreme Court denied allocatur, and therefore, the WC-ALJ's decision constitutes a final judgment on the merits.  Also, Plaintiff was clearly a party in the workers' compensation proceedings as the claimant. Finally, counsel for Plaintiff in the workers' compensation proceedings was aware of the JOEM articles and underlying research studies and Defendants' alleged wrongful conduct with regard thereto, and therefore had a full and fair opportunity to litigate the issue of whether Defendants' alleged fraudulent and/or deceitful conduct played any role in the denial of his claim for WCOD benefits.  Accordingly, Plaintiff is collaterally estopped from litigating in this Court the cause of or

basis for the denial of WCOD benefits.[24]

      To the extent that any of Plaintiff's claims includes an allegation as to the cause of or basis for denial of his WCOD benefits, Plaintiff is collaterally estopped from litigating that issue in this action.  In addition, to the extent Plaintiff's damages are based on the amount of WCOD and disability retirement benefits he would have otherwise received, said damages are likewise foreclosed.

          **3.**       **Plaintiff Fails to State a Claim for Negligence, Conversion, Fraud or Conspiracy Under Pennsylvania Law**

      Even if the two-year statute of limitations does not apply to bar Plaintiff's tort claims, or the collateral estoppel doctrine does not apply to foreclose litigating the issue of the cause of Plaintiff's injury/damages, as explained below the Court finds Plaintiff has nonetheless failed to allege sufficient facts to state claims for negligence, conversion/theft, fraud and civil conspiracy under Pennsylvania law.  Therefore, the Court recommends dismissal of the tort claims pursuant to Fed.R.Civ.P. 12(b)(6).

               **a.**     *Negligence*

      In order to establish a cause of action for negligence in Pennsylvania, a plaintiff must prove four elements: (1) "the existence of a duty or obligation recognized by law;" (2) a breach of that duty; (3) "a causal connection between the . . . breach and the resulting injury; and [(4)] actual loss

---

[24]Defendants also argue that Plaintiff's conversion/theft claim is collaterally estopped.  However, both the WCAP and Commonwealth Court found they did not have jurisdiction over Plaintiff's conversion claim because he raised it for the first time on appeal.  Nonetheless, the WCAB and Commonwealth Court proceeded to render an advisory opinion as to the merits of Plaintiff's conversion/theft claim.  This is dicta at best and does not meet the first requirement for collateral estoppel.  As the Supreme Court noted in *Thomas v. Gas Light Co.*, 448 U.S. 261, 282 (1980), res judicata principles may only be applied where the court had jurisdiction to decide the issue in the first instance.  Since the Pennsylvania workers' compensation tribunals found they did not have jurisdiction over Plaintiff's conversion/theft claim, the opinions of the WCAB and Commonwealth Court as to that claim are not entitled to collateral estoppel effect.

or damage suffered . . .." *Orner v. Mallick,* 515 Pa. 132, 135, 527 A.2d 521, 523 (1987) (citing *Morena v. South Hills Health Sys.,* 501 Pa. 634, 642 n.5, 462 A.2d 680, 864 n.5 (1983)). In support of his negligence claim, Plaintiff avers that Defendants' owed him a duty to "protect [his] Informed Consent protections codified at 45 C.F.R. § 46.116(d)(1)-(4)", as imposed pursuant to the Multiple Project Assurance Agreement of the University of Michigan and its Medical School, and/or IRB Review Informed Consent Submittal Agreement Assurance of Compliance, and/or the respective Individual Investigator Agreement (collectively referred to by Plaintiff as "MPAA"). (TAC ¶¶ 64-65.) Plaintiff further avers that Defendants breached this duty by failing to either inform him of his informed consent protections, obtain an effective waiver of said protections, and/or document the elements of effective waiver of said protections. (TAC ¶ 68.) As a result of this breach of duty, Plaintiff alleges he was denied his statutory right to WCOD and disability retirement benefits. (TAC ¶ 69.)

Defendants respond that Plaintiff cannot establish any facts to support these assertions. In particular, Defendants first argue that neither Section 46.116(d) nor any other authority cited by Plaintiff imposes a blanket prohibition against publishing DME results. Defendants further argue that DMEs are authorized as part of the litigation process, and release of a plaintiff's medical information obtained through a DME is authorized where the plaintiff has instituted litigation seeking recovery for personal injuries. In support of this argument, Defendants cite *Dennie v. Univ. of Pittsburgh School of Med.,* 638 F.Supp. 1005, 1008 (W.D.Pa. 1986), and *Doe v. WCAB (U.S.Air, Inc.),* 653 A.2d 715, 717 (Pa. Commw. 1995).

The Court agrees with Defendants. Assuming without deciding that Defendants had a duty under 45 C.F.R. § 46.116 and/or the MPAA to obtain the informed consent of their subjects or

document criteria for waiver of the informed consent requirements, Plaintiff has failed to allege facts which support a finding that Defendants breached that duty as to him.  By filing a claim for WCOD benefits, which clearly seeks an award of benefits for physical injuries, Plaintiff waived any claim of privilege as to all medical treatment and examinations as to the physical/psychological injuries of which he complains.  *Dennie,* 638 F.Supp. at 1008 (citing *In re Agent Orange Product Liability Lit.,* 91 F.R.D. 616 (E.D.N.Y. 1981); 42 Pa.C.S.A. § 5929 (Purdon's 1986)).  Plaintiff cannot claim an expectation of privacy as to the results of his medical examination and tests conducted by Defendants as part of the DMEs in the workers' compensation proceeding.

Defendants also correctly argue that even if the alleged violation of section 46.116(d) did constitute a breach of an owed duty, the Third Amended Complaint, documents identified therein, and documents of public record show that any violation was not attributed to Defendants.  In the Court's view, by alleging that the fraudulent DMEs of Plaintiff conducted by Defendants are research procedures subject to the informed consent protections of 45 C.F.R. § 46.116 (TAC ¶¶ 66-67), Plaintiff is attempting to conflate two entirely separate matters in a desperate attempt to create a breach of duty on the part of Defendants.  Plaintiff underwent medical examinations and tests by Defendants as part of DMEs at the request of his employer in the workers' compensation proceeding.  These examinations and tests occurred on September 7 and 8, 1999.  Entirely separate from the DMEs of Plaintiff in September 1999, Defendants conducted several human research studies at the University of Michigan School of Medicine ("UMSM"), the results of which were published in articles appearing in the JOEM in June, 1999 and 2000.  Obviously, the human research studies upon which the June 1999 JOEM article was based had to have been conducted prior to publication of the article in June 1999.  Plaintiff was not even examined by Defendants for the DMEs until September

1999. Moreover, it is clear from both the June 1999 and 2000 JOEM articles that the human subjects studied in Defendants' research were all railroad workers.  Plaintiff has not alleged any facts to show otherwise, his conclusory allegations notwithstanding.  Therefore, there was no need for Defendants to obtain Plaintiff's informed consent in the first instance because he was not part of the human research studies.

Further, the *UM IRB* waived the requirement to obtain informed consent for these studies. Therefore, Defendants were not obligated to obtain their subjects' informed consent for the studies. Rather, the IRB was obligated to set forth and document its findings as to the four criteria for waiver. Although there was an issue as to the IRB's failure to document the four criteria for waiver, this was eventually resolved to the satisfaction of OHRP.  Accordingly, the Court finds Plaintiff has not alleged facts to establish that Defendants breached their duty under 45 C.F.R. §46.116 to "protect Plaintiff's informed consent protections."

Finally, Plaintiff requests compensatory damages in an amount equal to his WCOD and disability retirement benefits ($980,000.00) plus the costs for health care necessary to treat his TSE as provided by the Pennsylvania WCA which he expects to exceed $ 3 million over his lifetime. (TAC ¶ 70.)  These damages are the same damages Plaintiff sought and was denied in his workers' compensation proceeding.  Since he has failed to allege any injuries separate and apart from those raised in his workers' compensation case, Plaintiff has failed to satisfy the fourth element required to establish a claim for negligence–an actual injury suffered.

Even if the Plaintiff had met his burden as to the second and fourth elements of a negligence claim, it strains credibility to suggest that the use of Plaintiff's PMI in research studies which formed the basis for JOEM articles caused the WC-ALJ to denial his claim for workers' compensation

benefits.   Moreover, as explained above, the issue of proximate cause is foreclosed by the doctrine of collateral estoppel.   Therefore, Plaintiff cannot allege or prove any set of facts to show that he has satisfied the third element of a cause of action for negligence.

Accordingly, the Court recommends that Plaintiff's claim for negligence be dismissed.

_____**b.**     *Conversion*

The thrust of Plaintiff's conversion claim is that Defendants obtained his PMI through fraudulent DMEs, distorted the results of the DMEs, and used and published this distorted PMI, without justification or his consent, in JOEM articles which were used to successfully defend the TSE claims of Plaintiff and railroad workers, resulting in actual damages consisting of the loss of his statutory right to WCOD and disability retirement benefits, and punitive damages.   (TAC ¶¶ 86-90.) In addition, Plaintiff contends Defendants' conversion of his PMI defrauded him of his personal property interest in his PMI.   (TAC ¶ 91.)   In their motion to dismiss, Defendants submit that Plaintiff's conversion claim fails for several reasons.

First, Defendants argue that they did not steal Plaintiff's PMI, as that PMI was gathered as part of authorized independent medical examinations conducted during his workers' compensation case, nor did they deprive him of any "rights" to his PMI or interfere with his use or possession of it.   In support of this argument, Defendants cite to the Commonwealth Court's conclusion in the workers' compensation appeal, which states in pertinent part that an IME in the context of a workers' compensation case "require[s] the release and analysis of such personal medical information." Commw. Ct. Op. at 10 n. 18.   Defendants also cite Plaintiff's acknowledgment at oral argument on the motion to dismiss Plaintiff's second amended complaint that Doctors Albers and Berent "did everything exactly right until they published his personal medical information without his consent."

24

(Tr. Oral Arg. 9/7/05 at 41.)   Thus, Defendants argue that they did not act without consent or legal justification.  Next, Defendants argue that despite Plaintiff's claims to the contrary, his PMI played no part in the cited studies.  According to Defendants, a cursory review of the cited studies, which are the centerpiece of Plaintiff's theft/conversion and fraud charges, demonstrates that the studies had nothing to do with Plaintiff's PMI.  Third, Defendants submit that Plaintiff has failed to identify the market value of his PMI, or the time or place of conversion.  Defendants further submit Plaintiff has failed to allege the market value of the other injured workers' allegedly converted personal medical information or their identities.  According to Defendants, these deficiencies also doom Plaintiff's conversion claim, citing *Northcraft v. Edward C. Michener Assoc.,* 319 Pa.Super. 432, 447, 466 A.2d 620, 628 (1983).  Finally, Defendants argue that an individual's personal medical information cannot be the subject of a conversion claim in Pennsylvania.

In response, Plaintiff submits several arguments.  First, Plaintiff counters that the tort of conversion refers to "chattel" which is defined as "an article of personal property; any species of property not amounting to a freehold or fee in land."  (Pl.'s Answering Br. at 19 (citing two Pennsylvania cases quoting Black's Law Dictionary, 3d ed., at 316.)  Because his PMI is not a freehold or fee in land, Plaintiff argues his PMI constitutes chattel and therefore may properly be the subject of a conversion action.  Moreover, Plaintiff submits that it is not relevant that there has never been a conversion action involving PMI in Pennsylvania; rather, what is relevant is that there is no Pennsylvania authority which excludes PMI as a subject of conversion.  Therefore, according to Plaintiff, based on *Pioneer Commercial Funding Corp. v. Am. Fin. Mortgage Corp.,* 579 Pa. 275, 855 A.2d 818 (2004), it appears PMI is subject to conversion in Pennsylvania.  Next, Plaintiff responds that OHRP, in its February 12, 2003 correspondence, found as a fact that Defendants

25

unlawfully interfered with his possession and use of his PMI and that these findings, together with Pennsylvania law suggesting that any "specie of property other than freehold in land" is subject to conversion, mandate the conclusion that Plaintiff is entitled to judgment on the pleadings on his conversion claim. Finally, in response to Defendants' argument that Plaintiff failed to plead the market value of his PMI, Plaintiff submits that conversion is an intentional tort which carries punitive damages and he has included a request for punitive damages in his Third Amended Complaint. Therefore, it is for a jury to decide the amount of punitive damages to which he is entitled, citing *Pioneer, supra.* Plaintiff also attempts to quantify the value of his PMI in his Answering Brief.

In their Reply Brief, Defendants challenge Plaintiff's argument that he may recover punitive damages, because he has failed to identify any compensable damages, which are a prerequisite to recovering punitive damages, citing *Martin v. Johns-Manville Corp.,* 508 Pa. 154, 173, 494 A.2d 1088, 1098 (1985); *Pioneer,* 579 Pa. at 299 n. 33, 855 A.2d at 833. Defendants also contend Plaintiff's valuation of the converted PMI in the "tens of millions" based on avoided litigation payouts is absurd. Defendants argue Plaintiff has failed to explain how the settlements of 44 TSE claims resulted in any "value" to them, who were expert witnesses, not parties, in some but not all of those cases. Even if Plaintiff's PMI were included in the JOEM articles which they maintain it was not, Defendants argue he could not possibly demonstrate that the articles dictated an unsuccessful outcome in any particular case

The required elements of a conversion claim in Pennsylvania are:

> [1]   "the deprivation of another's right of property in, or use or
>         possession of, a chattel, or other interference therewith,

[[2]]    without the owner's consent, and

(3)    without lawful justification."

*McKeeman v. Corestates Bank, N.A.,* 751 A.2d 655, 659 n.3 (Pa.Super. Ct. 2000) (quoting *Stevenson*

*v. Economy Bank of Ambridge,* 412 Pa. 442, 451, 197 A.2d 721, 726 (1964)) (other citation omitted).

Although the exercise of control over the property must be intentional, one does not have to prove

specific intent to commit a wrong in order to recover for conversion. *Id.* (citing *Norriton East Realty*

*Corp. v. Central-Penn Nat'l Bank,* 435 Pa. 57, 254 A.2d 637 (1969)).

As to the type of property that may be the subject of conversion, it is clear in Pennsylvania

that a cause of action for conversion may be maintained for almost all kinds of personal property,

including money, notes, bonds, certificates of stock, title deeds.  *Mackay v. Benjamin Franklin*

*Realty & Holding Co.,* 288 Pa. 207, 210, 135 A. 613, 614 (1927); *see also Northcraft v. Edward C.*

*Michener Assoc.,* 319 Pa.Super. 432, 441, 466 A.2d 620, 625 (1983) (citing cases involving

intangible property rights).   However, the  Pennsylvania courts have refused to recognize an action

for conversion where the property at issue involves a property right so entirely intangible that it is

not connected with physical property, such as ordinary debt, business good will, or ideas.  *Mackay,*

288 Pa. at 210, 135 A. at 614; *Northcraft,* 319 Pa. Super. at 441, 466 A.2d at 625.   Thus, in

Pennsylvania, an interest in intangible property cannot be the subject of a conversion action unless

that interest is of a type that is customarily merged in, or identified with some document. *Northcraft,*

319 Pa. Super. at 441, 466 A.2d at 625; *see also DirecTV v. Frick,* No. Civ. A. 03-6045, 2004 WL

438663, *2-3 (E.D.Pa. Mar. 2, 2004) (holding under Pennsylvania law, a satellite signal is intangible

property that cannot be converted) (citing *Northcraft, supra*; *Famology.com, Inc. v. Perot Sys. Corp.,*

158 F.Supp. 2d 589, 591 (E.D.Pa. 2001) (holding internet domain names do not constitute tangible

property)).

Although the Court has been unable to find any Pennsylvania cases addressing whether a property interest in PMI can be the subject of a conversion claim, the Court has found two New York state appellate division cases and a federal district court case in the Northern District of Iowa which have addressed conversions claims involving property/privacy interests in medical information. *See, e.g., Rao v. Verde,* 635 N.Y.S. 2d 660, 661 (N.Y.  App. Div. 1995) (holding that information obtained from medical records was intangible and therefore could not be the subject of a conversion claim); *Waldron v. Ball Corp.,* 619 N.Y.S. 2d 841, 843 (N.Y. App. Div. 1994) (holding that "possessory interest" in a patient's medical records did not constitute an intangible property right merged in, or identified with the medical records, and therefore, the court held an action for conversion was not cognizable[25]); *Hanson v. Hancock County Mem'l Hosp.,* 938 F.Supp. 1419, 1438 (N.D. Iowa 1996) (court rejected plaintiff's argument that privacy interest in hospital patient information constituted protected intangible personal property finding there was no authority for finding that plaintiff's privacy interest was in fact a property right, and in any event, it was not a property right that is "customarily merged in, or identified with, some document") (quoting *Hurst v. Dezer/Reyes Corp.,* 82 F.3d 232, 235-36 (8th Cir. 1996)) (other citations omitted).   None of these cases found that a privacy or possessory  interest in medical information/records constituted a cognizable property right; and even if it was a property right, the cited authority held it was not one of the narrowly defined intangible property interests to which a conversion claim should apply.

Turning to the merits of Defendants' arguments, the Court concludes that Plaintiff's interest

---

[25]The New York Supreme Court in *Waldron* also found that although patients have a right to access their records regarding medical treatment, it is well established under New York law that these records become property belonging to the treating doctors.  619 N.Y.S. 2d at 843 (citations omitted).

in his PMI does not appear to be the type of property interest that Pennsylvania would recognize as the subject of a conversion claim.  Since neither the Pennsylvania Supreme Court, nor any intermediate appellate court in Pennsylvania, has addressed this issue, this Court must predict how the Pennsylvania Supreme Court would rule on this issue.  Based on the authority cited above, the Court concludes that a property interest in medical information is an intangible right that is not customarily merged in or identified with some document, and therefore, cannot be the subject of a conversion claim in Pennsylvania

Plaintiff's reliance on *Pioneer* in support of his argument that PMI may be the subject of a conversion action in Pennsylvania is misplaced.  *Pioneer* involved a commercial priority dispute between a banking institution exercising a set off against a general deposit account and a company asserting a third party interest in account proceeds.  In that case, there was no question that the property at issue, identifiable account funds, were chattel for purposes of the conversion action.  579 Pa. at 289 n.21, 855 A.2d at 827 n. 21.  Rather, the issue in *Pioneer* was whether a lawful justification existed under principles of commercial law for the bank's action in mistakenly seizing wired funds.  Thus, *Pioneer* is factually distinguishable from the case at bar and provides no support for Plaintiff's contention that his PMI may be the subject of a conversion action.

It also appears that Defendants' independent medical examinations of Plaintiff, including medical tests, were conducted pursuant to an authorized consent in the workers' compensation case and indeed, Plaintiff concedes as much.  Therefore, Defendants had lawful justification for using Plaintiff's PMI in his workers' compensation case.  Moreover, the Court is not required to accept as true Plaintiff's unsupported conclusion that Defendants used his PMI in the research studies without his consent or lawful justification.  In deciding a motion to dismiss, a court "need not accept

as true 'unsupported conclusions and unwarranted inferences.'" *City of Pittsburgh, v. West Penn Power Co.,* 147 F.3d 256, 263 (3d Cir. 1998) (quoting *Schuylkill Energy Resources, Inc. v. Pa. Power & Light Co.,* 113 F.3d 405, 417 (3d Cir. 1997)).  In deciding a motion to dismiss, a court is not required to take the allegations of the complaint at face value.  *Id.*  As the Court of Appeals opined in *City of Pittsburgh,* courts must "view the complaint as a whole and . . . base rulings not upon the presence of mere words, but rather, upon the presence of a factual situation which is or is not justiciable.  We do draw on the allegations of the complaint, but in a realistic, rather than a slavish, manner."  *Id.*  (footnote omitted).

In analyzing Plaintiff's conversion claim in this manner, it is clear from the published JOEM articles that Plaintiff could not have been one of the subjects of the research studies upon which the JOEM articles are based.[26]  In addition, it is physically impossible for Plaintiff to have been included in the research study upon which the June 1999 article is based since that article was published three months prior to Defendants' examinations of Plaintiff.  Moreover, as Plaintiff alleges, the studies were funded partially by the railroad industry to address an onslaught of FELA claims by railroad workers claiming occupational disease due to TSE.  (TAC ¶¶ 16-17.)   Plaintiff, however, worked as a maintenance repairman and eventually progressed to maintenance leader/foreman in a steel processing/finishing plant. (WC-ALJ Decision dated 12/7/00 at 2.) Further, it defies logic to suggest that the railroad industry and/or the researchers would be interested in the medical history/records of a non-railroad worker in the research studies on railroad workers.  Therefore, viewing the

---

[26]Both of the JOEM articles describe the subjects of the research studies: The June 1999 article indicates that the human research subjects consisted of "thirty railroad workers previously diagnosed with toxic encephalopathy"; the 2000 JOEM article indicates that the subject of the research study consisted of "52 railroad workers with long-term occupational solvent exposures . . . previously diagnosed . . . as having solvent-induced toxic encephalopathy."

complaint and documents identified therein in a realistic manner, the Court concludes that the allegations in the Third Amended Complaint do not establish that Defendants used Plaintiff's PMI in their research studies, let alone without his consent or lawful justification.[27]

Accordingly, Plaintiff has failed to plead a claim for conversion under Pennsylvania law. Therefore, the Court recommends that Plaintiff's conversion claim be dismissed with prejudice.

### c.      *Fraud*

In order to state a claim for fraud in Pennsylvania, Plaintiff must prove by clear and convincing evidence the following six elements: "(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance. *Gibbs v. Ernst,* 538 Pa. 193, 207-08, 647 A.2d 882, 889 (1994) (footnote and citations omitted); *Goldstein v. Phillip Morris, Inc.,* 854 A.2d 585, 590-91 (Pa. Super. Ct. 2004) (citation omitted).  In addition, Federal Rule of Civil Procedure 9(b) requires the plaintiff to state with particularity the circumstances constituting the fraud.  *See also, Lum v. Bank of America,* 361 F.3d 217, 223-24 (3d Cir. 2004).  Allegations of fraud which are general or conclusory will not satisfy the specificity requirement of Rule 9(b).  *Id.* at 224.  A plaintiff may satisfy the requirements of Rule 9(b) "by pleading the 'date, place or time' of the fraud, or through 'alternative means of injecting precision

---

[27]The Court finds no merit in Plaintiff's argument that OHRP's February 12, 2003 letter conclusively determined Defendants unlawfully interfered with Plaintiff's possession and use of his PMI.  Plaintiff seriously misstates the contents of this letter and it is disingenuous to represent to the Court that OHRP found anything other than the UM-IRB failed to document the criteria for waiver of the informed consent requirements.  Plaintiff's conclusion is simply not warranted by the actual contents of the letter.  Moreover, because the Court has found that Plaintiff's property interest in his PMI cannot be the subject of a conversion action in Pennsylvania, and that Defendants' used Plaintiff's PMI with consent and lawful justification, the Court finds it is not necessary to address Defendants' remaining argument.

and some measure of substantiation into [his] allegations of fraud.'" *Id.* (citation omitted).  In addition, the plaintiff must allege the identity of the person or persons who made a misrepresentation, to whom the misrepresentation was made, and the general content of the misrepresentation. *Id.* (citations omitted).

In support of his fraud claim, Plaintiff alleges in the Third Amended Complaint that Defendants' fraudulent actions consisted of arranging for Plaintiff to undergo the DMEs, which served as a fraudulent device to obtain, distort, and convert Plaintiff's PMI for publication in the JOEM and use by the railroads in defense of TSE claims of railroad workers.   (TAC ¶¶ 81 a-b.) Plaintiff further alleges: (1) Defendants and designated counsel actively concealed their fraudulent purpose from Plaintiff (TAC ¶ 81c); (2) Defendants and designated counsel conspired to and intentionally obtained and converted Plaintiff's PMI, thereby violating the informed consent requirements of 45 C.F.R. § 46.116(d)(1)-(4) and the protections of HIPAA, 42 U.S.C. § 1320d-6(b) (TAC ¶¶ 81 d & e); (3) Defendants induced Plaintiff through active concealment to rely on their respective misrepresentations that the DMEs were limited in nature and not intended to be used in railroads' defense of TSE claims (TAC ¶¶ 81f); (4) Defendants negotiated and received payment for fraudulent conversion of Plaintiff's PMI from ROICO and deliberately deceived Plaintiff and the UM-IRB (TAC ¶ 81 g); and (5) ROICO paid Defendants to find that the results of Plaintiff's DMEs were negative for signs and symptoms of TSE, to publish the results in JOEM, and to testify in legal proceedings that Plaintiff did not suffer from TSE (TAC ¶¶ 81 h-j).  In addition, Plaintiff alleges he "reasonabl[y] relied upon the material misrepresentations which operated to actively conceal the fraud which dispossessed Plaintiff from his TSE by Defendants . . . and designated counsel." (TAC ¶ 82.)  Finally, Plaintiff avers Defendants' fraudulent conduct proximately caused an "illegal[]

32

obstruct[ion]" of his statutory right to WCOD and disability retirement benefits, and denied him his statutory right to health care necessary to treat his TSE as provided by the WCA.  (TAC ¶ 83.)

Defendants argue that Plaintiff's fraud claim should be dismissed because these allegations of fraud fail to meet the specificity requirements of Fed. R. Civ. P. 9(b).  Defendants further argue that Plaintiff has failed to set forth the requisite elements of liability for fraud.  In support of their argument, Defendants submit that Plaintiff fails to: (1) identify specific misrepresentations made by Defendants; (2) specify when, how or where such misrepresentations were made; or (3) explain how he was induced to rely on any such misrepresentation.  Defendants posit that this lack of detail is attributed to the nature of an independent medical examination–a party submits to an IME because he is required to do so under the rules of procedure if he wishes to proceed with his lawsuit, not because the examining physician promises or represents something in return.  In any event, Defendants submit that Plaintiff has failed to establish that the denial of his statutory rights to WCOD and disability retirement benefits were the immediate and proximate consequence of Plaintiff's reliance on Defendants' alleged misrepresentations, citing *Crawford v. Pituch,* 368 Pa. 489, 495, 84 A.2d 204, 207 (1951) (holding that the only damages recoverable were those damages which were the immediate and proximate consequence of defendant's deceit, and disallowing recovery for consequential, speculative and conjectural damages).

In response, Plaintiff submits that the allegations of fraud in the Third Amended Complaint are sufficient to survive a motion to dismiss under Rule 12(b)(6).  In support of his argument, Plaintiff submits that the pleading requirements of Pennsylvania Rule of Civil Procedure 1019(b) apply and under that standard, he has pled sufficient facts to support his fraud claim.  However, Plaintiff's argument misses the mark.  Although state law governs the burden of proving fraud at

trial, the federal rules govern the procedure for pleading fraud in diversity cases filed in federal court. *Capitol Life Ins. Co. v. Rosen*, 69 F.R.D. 83, 89 (E.D.Pa. 1975) (citation omitted); *Hayduk v. Lanna*, 775 F.2d 441, 443 (1st Cir. 1985) (citing 5 C. Wright and A. Miller, *Federal Practice & Procedure*, §§ 1204, 1296 (1969)) (other citation omitted); *Thresher v. Gulf States Paper Corp.,* 244 F.Supp. 2d 175, 178 (W.D.N.Y. 2003) (citing 2 Moore's Federal Practice (2002) § 9.03[e]).  Therefore, the special pleading requirements of Federal Rule of Civil Procedure 9(b) govern Defendants' challenge to the sufficiency of Plaintiff's fraud claim.

Turning to the allegations of fraud in the Third Amended Complaint, the Court finds the allegations contained in paragraphs 81 through 83 are either conclusory or contrary to established facts and therefore incapable of being proven at trial.  Moreover, none of the allegations in paragraphs 81 through 83 states with specificity the date, place or time of the allegedly fraudulent actions, or the content of the misrepresentations and identities of the persons making and receiving the misrepresentations.  Nor does Plaintiff indicate how he was induced to rely on the alleged misrepresentations.  Accordingly, the Court finds Plaintiff's allegations of fraud to be woefully deficient of the pleading standard required by Rule 9(b) and therefore recommends Plaintiff's fraud claim be dismissed with prejudice.[28]

---

[28]This is not a situation where Plaintiff's fraud claim should be dismissed without prejudice with leave to file yet another amended complaint.  Plaintiff is not entitled to an unlimited number of bites from the proverbial apple.  *See Rolo v. City Investing Co. Liquidating Trust,* 155 F.3d 644, 659 (3d Cir. 1998) (citing *Gasoline Sales, Inc. v. Aero Oil Co.,* 39 F.3d 70, 74 (3d Cir. 1994)).  He has already had four opportunities to adequately plead his claim and has failed to cure the deficiencies.  Moreover, the Court cannot envision any set of facts that would establish a *prima facie* claim of fraud.  Therefore, allowing Plaintiff to file yet another amended complaint would be futile.  Under these circumstances, the Court recommends Plaintiff's fraud claim be dismissed with prejudice. *Gasoline Sales,* 39 F.3d at 74.

### d.      *Conspiracy*

As to Plaintiff's conspiracy claim, Defendants correctly argue that since Plaintiff has failed

to state a common law claim of fraud or conversion, Plaintiff's civil conspiracy claim likewise fails.

In Pennsylvania, to state a claim for conspiracy, a plaintiff must allege:

> 1)      A combination of two or more persons acting with a common
>         purpose to do an unlawful act or to do a lawful act by
>         unlawful means or for an unlawful purpose;
>
> 2)      an overt act done in pursuance of the common purpose; and
>
> 3)      actual legal damage.

*Goldstein v. Phillip Morris, Inc.,* 854 A.2d at 590 (citation omitted).  Moreover, "'absent a civil

cause of action for a particular act, there can be no cause of action for civil conspiracy.'" *Id.* (quoting

*McKeeman v. Corestates Band, N.A.,* 751 A.2d 655, 660 (Pa. Super. Ct. 2000)).  Also essential to

maintaining a claim for conspiracy is proof of malice.  *Id.*  (citation omitted).

Given that Plaintiff has failed to state a claim for conversion and fraud, his civil conspiracy

claim fails as a matter of law.  Therefore, the Court recommends Plaintiff's cause of action for civil

conspiracy be dismissed with prejudice.

### 4.      Plaintiff Fails to State a Claim for Violations of <u>RICO and Conspiracy to Violate RICO</u>

#### a.      *Violation of Sections 1962 & 1964(c) of RICO (Count VI)*

The essence of Plaintiff's claim in Count VI of the Third Amended Complaint is that

Defendants violated Sections 1962 and 1964(c) of RICO, by conspiring with and acting in

furtherance of the ROIICO enterprise whose goal was to distort, convert, and publish distorted PMI

of 100 or more TSE claimants in articles used by ROIICO to defend TSE claims, and that each of

these 100 plus acts violated HIPAA's criminal provisions[29] and, as such, are predicate acts which establish a pattern of criminal conduct necessary to establish a RICO violation.  (TAC ¶¶ 103-04; Pl.'s Answering Br. at 12-13.)  Plaintiff further avers that his "property interest in his PMI was damaged consequent to the . . . [D]efendants' violations of 42 U.S.C. § 1320d-6(b) (HIPAA Section 1177)."  (TAC ¶ 105.)  As a result of Defendants' alleged conduct, Plaintiff submits he sustained serious *personal* injuries including, among other things, intentionally inflicted emotional distress,[30] physical pain and mental distress, a diminished capacity for enjoyment of life, and denial of medical care and treatment; he also contends he sustained serious *financial* injuries, including sustained loss of income, diminished earning capacity, costs for past and future medical treatment and care, and other "substantial economic losses."  (TAC ¶ 106.)

Under 18 U.S.C. § 1964(c), Congress authorized civil suits by "[a]ny person injured in his business or property by reason of a violation of [18 U.S.C. § 1962]."  Section 1962 contains four separate subsections, each prohibiting a different type of conduct:

> Section 1962(a) prohibits "any person who has received any income derived . . . from a pattern of racketeering activity" from using that money to acquire, establish or operate any enterprise that affects interstate commerce.  Section 1962(b) prohibits any person from acquiring or maintaining an interest in, or controlling any such enterprise "through a pattern of racketeering activity."  Section 1962(c) prohibits any person employed by or associated with an enterprise affecting interstate commerce from "conduct[ing] or participat[ing] . . . in the conduct of such enterprise's affairs through a pattern of racketeering activity."  Finally, section 1962(d) prohibits any person from "conspir[ing] to violate any of the provisions of

---

[29]Plaintiff contends that Defendants' unauthorized use of Plaintiff's PMI violates the criminal provisions of HIPAA.  (Pl.'s Answering Br. at 13.)

[30]Plaintiff has failed to plead any facts in support of his claim that Defendants' conduct has resulted in intentional infliction of emotional distress.  Therefore, the Court does not construe the Third Amended Complaint as setting forth a cognizable claim for intentional infliction of emotional distress.

subsections (a), (b), or (c)."

*Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1411 (3d Cir. 1991) (quoting 18 U.S.C. §

1962(a) - (d)).  A "pattern of racketeering activity" requires the commission of at least two predicate

offenses from the list delineated in 18 U.S.C. § 1961(1).  *See* 18 U.S.C. § 1961(5) (West 2000).  This

entails a showing by the plaintiff "'that the racketeering acts are related, *and* that they amount to or

pose a threat of continued criminal activity.'" *Kehr Packages,* 926 F.2d at 1412 (quoting *H.J. Inc.*

*v. Northwestern Bell Tele. Co.,* 492 U.S. 229, 239 (1989)).  A "racketeering activity" is defined

under RICO as "any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery,

extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical . . .,

which is chargeable under State law and punishable by imprisonment for more than one year;" or

any act which is indictable under specifically enumerated federal criminal statutes.  18 U.S.C.A. §

1961(1) (West 2000).  An "enterprise" is defined as "any individual, partnership, corporation,

association, or other leal entity, and any union or group of individuals associated in fact although not

a legal entity." 18 U.S.C.A. § 1961(4) (West 2000).  If a violation of section 1962(c) is alleged, an

entity cannot be both an enterprise and a defendant.[31]  *Id.* (citation omitted).  Moreover, to the extent

the alleged violations of RICO are based on fraud, the heightened pleading requirements of

Fed.R.Civ.P. 9(b) apply.  *Lum v. Bank of America,* 361 F.3d 217, 223 (3d Cir. 2004) (citing *Saporito*

*v. Combustion Eng'g, Inc.,* 843 F.2d 666, 673 (3d Cir. 1988), *vacated on other grounds* 489 U.S.

1049 (1989)).

In support of their motion to dismiss Plaintiff's RICO claim, Defendants advance several

---

[31]In Count VI of the Third Amended Complaint, Plaintiff appears to be alleging a violation of subsection (c) of Section 1962.  (TAC ¶ 100.)  Plaintiff's allegations of a RICO conspiracy under Section 1962(d) are set forth in Count V and are discussed *infra* in Part 4.b.

arguments for the Court's consideration.  First, Defendants argue that the Third Amended Complaint fails to allege a "racketeering activity" as that term is defined under RICO.  Defendants submit that the only predicate acts purportedly identified in the Third Amended Complaint consist of the 100 plus alleged instances of theft and conversion of Plaintiff's and the other TSE claimants' PMI.  Even assuming for argument's sake they stole and converted the PMI as alleged, Defendants submit that none of this conduct, including the alleged criminal violations of HIPAA, falls within the racketeering activities delineated under Section 1961(1).  Thus, according to Defendants, Plaintiff has not and cannot allege a pattern of racketeering activity, let alone a single racketeering activity, and therefore, Plaintiff's RICO claim must fail.

In further support of dismissal of Plaintiff's RICO claim, Defendants argue that Plaintiff has failed to allege in his Third Amended Complaint and prove that he has been injured in his business or property, as required by Section 1964(c).[32]  Defendants submit that for purposes of Section 1964(c), allegations of injury to a plaintiff's business or property do not include personal injuries, citing *Gentry v. Resolution Trust Corp.,* 937 F.2d 899, 918-19 (3d Cir. 1991); *Zimmeran v. HBO Affiliate Group,* 834 F.2d 1163, 1169 (3d Cir. 1987); *Murphy v. Bancroft Constr. Co.,* No. 04-2929, 2005 U.S. App. LEXIS 7888, *7-8 (3d Cir. May 5, 2005); *Fried v. Sungard Recovery Serv., Inc.,* 900 F.Supp. 758, 762 (E.D.Pa. 1995).  Thus, Defendants maintain that because Plaintiff's core injuries are medical in nature or pecuniary losses arising therefrom, said injuries are not recoverable under RICO.

Defendants further argue that to the extent Plaintiff seeks to evade this problem by asserting

---

[32]With regard to their argument that Plaintiff is required to allege and prove an injury to his business or property, Defendants refer continuously to Section 1962(c).  However, Court believes Defendants meant to cite to Section 1964(c).

that his PMI constitutes RICO "property," no authority exists supporting such a contention, and even

if authority did exist, Plaintiff has not articulated a compensable "injury" under Section 1964(c).

In support of this argument, Defendants cite *Anderson v. Ayling,* 396 F.3d 265, 271 (3d Cir. 2005),

for the proposition that "'a showing of injury requires proof of a concrete financial loss and not mere

injury to a valuable intangible property interest.'" *Id.* (citing *Maio v. Aetna, Inc.,* 221 F.3d 472, 483

(3d Cir. 2000) (quoting *Steele v. Hosp. Corp. of Am.,* 36 F.3d 69, 70 (9th Cir. 1994)). Defendants

further submit that Plaintiff has failed to explain how he could have property interests in the PMI of

the other 100 plus TSE claimants and/or how a RICO violation of those interests resulted in a

cognizable injury to Plaintiff. Because Plaintiff lacks a concrete financial loss to his business or

property, Defendants maintain Plaintiff's RICO claim should be dismissed.

Finally, Defendants argue that even if Plaintiff had properly identified a racketeering activity

and a cognizable injury to his business or property, he has failed to allege how such violations

proximately caused any injuries. Therefore, based on *Allegheny Gen. Hosp. v. Philip Morris, Inc.,*

228 F.3d 429, 443-46 (3d Cir. 2000) ("*AGH*"), Plaintiff's RICO claim likewise fails.[33]

In response, Plaintiff reiterates the allegations contained in the Third Amended Complaint

and argues that the alleged conduct is sufficient to state a claim for violations of Sections 1962 and

1964(c) of RICO. He does not attempt to address Defendants' arguments that the allegations do not

set forth a "racketeering activity" as defined under Section 1961(1), other than to argue merely that

the predicate acts for RICO purposes are Defendants' violation of HIPAA's criminal provisions

---

[33]Defendants advance an additional argument in support of their motion to dismiss. Defendants submit that RICO claims must be pleaded with specificity where the underlying acts involve allegations sounding in fraud and the Third Amended Complaint is woefully deficient in this regard. Because the Court finds Plaintiff's civil RICO claim deficient on other grounds, it need not address this argument.

which resulted from Defendants' violation of the informed consent protections which is an unauthorized use of his PMI.

Defendants' arguments are convincing. Plaintiff's RICO claim is fatally flawed due to the absence of any allegations of a recognized racketeering activity. Nor can the Court envision any set of facts that would establish a racketeering activity under RICO.[34] However, even if Plaintiff had alleged a cognizable racketeering activity, which he has not, his RICO claim is barred for a more primal reason in that he lacks standing under Section 1964(c) to bring a civil RICO claim.

In order to assert a civil RICO claim, a plaintiff must first satisfy the requirements of Section 1964(c), which has been referred to as the "standing" provision of RICO. *Maio,* 221 F.3d at 482 n.7 (citing *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.,* 140 F.3d 494, 520-21 (3d Cir. 1998)). The requirements for standing are two-fold: (1) injury to the plaintiff's business or property; and (2) the alleged RICO violations must have proximately caused said injury. *Id.* For the reasons set forth below, the Court finds Plaintiff has failed to meet both requirements.

With regard to the "injury" prong of the standing test, Plaintiff alleges that his "property interest in his PMI was damaged [as a result of] defendants' violations of 42 U.S.C. § 1320d-6(b) (HIPAA Section 1177)." (TAC ¶ 105.) However, all of the injuries Plaintiff claims to have suffered constitute either personal injuries (intentionally inflicted distress, physical pain and mental distress, a diminished capacity to enjoy life, intentional infliction of emotional distress, denial of medical treatment and care), or financial injuries that derive from the alleged personal injuries (*i.e.,* incurred medical bills for treatment and care, loss of income, diminished earning capacity, and other substantial economic losses), none of which are deemed compensable under RICO. As the Court

---

[34]*See* note 28, *supra.*

of Appeals noted in *Genty v. Resolution Trust Corp.,* "[i]n ordinary usage, 'injury to business or property' does not denote physical or emotional harm to a *person*.  Indeed, the Supreme Court has declared that Congress's limitation of recovery to business or property injury 'retains restrictive significance.  It would for example exclude personal injuries suffered.'" 937 F.2d at 918 (quoting *Reiter v. Sonotone Corp.,* 442 U.S. 330, 339 (1979)); *see also Zimmerman,* 834 F.2d at 1169 (alleged injury of mental distress did not constitute an injury in business or property for RICO standing); *Fried,* 900 F.Supp. at 762-63 (declining to find plaintiff's claim for hazard pay constituted an "injury" for RICO standing where hazard pay would have allegedly been paid to induce workers to work in an environment contaminated by dangerous asbestos fibers; in reality hazard pay constituted compensation for fear of catching a disease which is a type of emotional distress not covered by RICO).  Moreover, to the extent a RICO plaintiff attempts to claim financial losses that *derive from the personal injuries*, the courts have refused to find a cognizable injury to property for RICO standing purposes.  *See Thomas,* 2005 U.S. App. LEXIS 7888, at * 7-8 (affirming district court's rejection of civil RICO claim where alleged injury from RICO violations consisted of lost earning capacity due to depression which was found to be a non-cognizable injury under RICO); *Fried*, 900 F.Supp. at 762 (quoting *Grogan v. Platt,* 835 F.2d 844, 847 (11th Cir. 1988) (recognizing that although "'recovery for personal injury has pecuniary aspects' . . . it is important to distinguish between the pecuniary harm that arises from personal injuries and the pecuniary harm that arises from injury to business or property.")

Also problematic is Plaintiff's allegation that Defendants' RICO violations caused him to sustain injury to *his property interest in his PMI*.  First, Plaintiff's property interest in his PMI is, at best, "valuable *intangible* property" which the Court of Appeals has indicated is normally not the

type of property which, when injured, is capable of incurring a concrete financial loss, and therefore, is insufficient to create RICO standing. *Anderson*, 396 F.3d at 271 (quoting *Steele*, 36 F.3d at 70) (to prove an "injury" for RICO standing, plaintiff must show "'a concrete financial loss and not merely injury to a valuable intangible property interest'"). In *Anderson*, plaintiffs' claim of injury as a result of defendants' alleged RICO violations (mail fraud) was two-fold: (1) termination from employment;[35] and (2) "injury from the corruption of their local [union.]" *Id.*   As to the second alleged injury, the Court of Appeals found that plaintiffs failed to demonstrate any concrete losses, financial or otherwise, from the alleged corruption of their local union, and therefore, concluded that plaintiffs failed to state a cognizable injury for RICO standing. *Id.* at 271 (citing *Maio,* 221 F.3d at 483).

Like the plaintiffs in *Anderson,* Plaintiff's alleged injury to his property interest in his PMI is, at best, merely an injury to a valuable intangible property interest, the damage to which is speculative and incapable of quantification.   Further, Plaintiff's claimed injuries of out of pocket medical expenses, lost income, diminished earning capacity, although capable of valuation, all derive from his alleged TSE and the denial of his workers' compensation claim, not an alleged injury to his intangible property interest in his PMI.   Therefore, Plaintiff's alleged injuries are not the type of "injury" that creates RICO standing.

As to the second standing requirement, Plaintiff has failed to show that the alleged injuries were proximately caused by Defendants' alleged RICO violations.   In *Holmes v. Sec. Investor Prot.*

---

[35]As to the first alleged injury, the Court of Appeals in *Anderson* concluded that although job loss is not speculative in that plaintiffs' claims were for lost wages, this was not the kind of injury that normally creates RICO standing  because plaintiffs failed to allege sufficient facts to show that the alleged RICO violations proximately caused them to lose their jobs.  396 F.3d at 270-71.  The court's conclusion in this regard turned on its proximate cause analysis which is discussed more fully *infra* at 48-50.

*Corp.,* 503 U.S. 258, 268 (1992), the Supreme Court held that in order to bring a civil RICO cause

of action, the plaintiff must show  that the alleged RICO violation "not only was a 'but for' cause

of his injury, but was  the proximate cause as well."  The Supreme Court further opined:

> [W]e use "proximate cause" to label generically the judicial tools
> used to limit a person's responsibility for the consequences of that
> person's own acts.  At bottom, the notion of proximate cause reflects
> "ideas of what justice demands, or of what is administratively
> possible and convenient."  Accordingly, among the many shapes this
> concept took at common law was a demand for some direct relation
> between the injury asserted and the injurious conduct alleged.  Thus,
> a plaintiff who complained of harm flowing merely from the
> misfortunes visited upon a third person by the defendant's acts was
> generally said to stand at too remote a distance to recover.

*Id.* at 268-69 (internal citations omitted).  Thus, in determining whether proximate cause exists for

RICO standing, the Court took into account the following three factors:

> First, the less direct an injury is, the more difficult it becomes to
> ascertain the amount of a plaintiff's damages attributable to the
> violation, as distinct from other, independent, factors. Second, . . .
> claims of the indirectly injured would force courts to adopt
> complicated rules apportioning damages among plaintiffs removed at
> different levels of injury from the violative acts, to obviate the risk of
> multiple recoveries.  And, finally, the need to grapple with these
> problems is simply unjustified by the general interest in determining
> injurious conduct, since directly injured victims can generally be
> counted on to vindicate the law as private attorneys general, without
> any of the problems attendant upon suits by plaintiffs injured more
> remotely.

*Id.* at 269-70 (citing *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters,*

459 U.S. 519, 541-44 (1983)) (other internal citations omitted) ("*AGC*");[36] *see also Steamfitters*

---

[36]Although the proximate cause analysis in *AGC* involved violations of antitrust law, the Supreme Court and U.S. Court of Appeals for the Third Circuit have noted that such analysis applies equally to civil RICO claims brought under § 1964(c).  *Holmes,* 503 U.S. at 268; *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.,* 171 F.3d 912, 932 (3d Cir. 1999) (citing *Holmes, supra,* and *McCarthy v. Recordex Serv., Inc.,* 80 F.3d 842, 855 (3d Cir. 1996)).

*Local Union No. 420 Welfare Fund v. Philip Morris, Inc.,* 171 F.3d 912, 932 (3d Cir. 1999)("*Steamfitters*") (citing *Holmes, supra*); *AGH,* 228 F.3d at 443 (citing *Holmes* and *Steamfitters, supra*).  Commenting on the public policy arguments of the parties, the Supreme Court opined that "[a]llowing suits by those injured only indirectly would open the door to 'massive and complex damages litigation[, which would] not only burde[n] the courts, but [would] also undermin[e] the effectiveness of treble-damages suits.'" 503 U.S. at 274 (quoting *AGC,* 459 U.S. at 545).  Therefore, in "evaluat[ing] a RICO claim for proximate causation, the central question [a court] must ask is whether the alleged violation led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.,* 126 S.Ct. 1991, 1998 (2006).

Here the Court starts its proximate cause analysis with a review of the Supreme Court's decision in *Holmes.*  In that case, the Securities Investor Protection Corporation ("SIPC") brought a civil RICO claim against defendants who were alleged to have conspired to manipulate stock prices, which led to losses for two broker-dealers, which in turn prevented those broker-dealers from meeting obligations to customers who had not purchased the manipulated stock ("non-investing customers"), thereby triggering SPIC's duty to advance funds to reimburse the non-investing customers.  503 U.S. at 261.  SPIC claimed it had met the requirements for RICO standing because it was subrogated to the rights of the non-investing customers.  The Supreme Court found that even if SIPC did have subrogation rights, which the Court assumed without deciding, the link between the alleged stock manipulation and the non-investing customers' harm was solely contingent on the harm suffered by the broker-dealers, and therefore, was too remote to establish an injury to SIPC's business or property for RICO standing.  *Id.* at 271.

Very recently, the Supreme Court again considered whether proximate cause was lacking

in a civil RICO claim brought pursuant to Section 1962(c), involving the directness of an injury to a corporation's business, in the form of lost sales, allegedly caused by a competitor's acts of tax fraud, and mail and wire fraud, which were directed at the state taxing authority. *Anza v. Ideal Steel Supply Corp., supra*. Specifically, the plaintiff claimed it lost sales as a result of defendant's decreased prices (from failing to assess state sales tax) for cash-paying customers. Applying the principles of *Holmes* to the facts of that case, the Supreme Court concluded that proximate cause was lacking, finding that the state taxing authority was the direct victim of defendant's wrongful acts as it had been defrauded by, and lost tax revenue as a direct result of, defendant's acts. 126 S.Ct. at 1996-97. The Court opined that the "attenuated connection between [plaintiff's] injury and the [defendant's] injurious conduct . . . implicate[d] fundamental concerns expressed in *Holmes*." *Id.* at 1997. The Court reasoned that several independent bases may have existed to have caused the defendant to lower its prices, such as receipt of an inflow of cash from another source, or a business decision to accept a smaller profit margin in exchange for increased sales. Moreover, the Court opined that just because a company may commit tax fraud does not mean it will lower its prices with the excess cash. The Court further noted that plaintiff's lost sales could have resulted from factors other than defendant's alleged fraud. *Id.* at 1997. These concerns, along with the speculative nature of the proceedings that would ensue if plaintiff were permitted to maintain its Section 1962(c) claim, and the fact that the state, as the immediate victim of the alleged RICO violation could be expected to vindicate the laws by filing its own claim, provided additional support for the Court's conclusion that plaintiff's alleged injury was not the direct result of a RICO violation, and therefore, proximate cause was lacking. *Id.* at 1997-98.

A seminal case on the proximate cause requirement for RICO standing in this Circuit is

*Steamfitters, supra.*  In that case, plaintiffs, union and health and welfare funds ("funds"), brought claims for violations of antitrust and civil RICO statutes against tobacco companies.  171 F.3d at 916.  The gravamen of the funds' complaint was that the "tobacco companies conspired to suppress research on safer tobacco products, defrauded health care providers and payers by informing them that [their] tobacco products were safe, and caused smokers to become ill by preventing the dissemination of smoking-reduction and smoking-cessation information."  *Id.* at 918.  As a consequence of the intentional and fraudulent acts of the tobacco companies, directed at both smokers and the funds, it was alleged that the costs of smoking-related illnesses were improperly shifted from the tobacco companies to the funds.  *Id.* at 918-19.  The funds sought to recover payment of millions of dollars for the smoking-related medical expenses of the funds' participants who were allegedly victimized by the tobacco companies' conspiracy and fraud.  *Id.* at 919.  The Court of Appeals found that the funds' claims "necessarily fail[ed] for being too remotely connected in the causal chain from any wrongdoing on defendants' part." *Id.* at 928.  Indeed, the *Steamfitters* Court observed:

> The sheer number of links in the chain of causation that connect defendants' suppression of information on the dangers of their products and withholding of safer tobacco products from the market to the funds' increased expenditures are greater than in any [jurisprudence] in which this court or the Supreme Court has found antitrust standing. . . . the tortured path that one must follow from the tobacco companies' alleged wrongdoing to the funds' increased expenditures demonstrates that the plaintiffs' claims are precisely the type of indirect claims that the proximate cause requirement is intended to weed out.

171 F.3d at 930 (citation omitted).[37]

Moreover, the Court of Appeals in *Steamfitters* based its conclusion as to the lack of RICO standing on the speculative and attenuated nature of the funds' claims. *Id.* at 933. In this regard, the Court of Appeals found if it allowed the funds to proceed with their RICO and antitrust claims, it would be required to determine the extent to which their increased costs for smoking-related illnesses resulted from tobacco companies' alleged conspiracy as opposed to independent causes, such as the participants' other health problems, decisions to smoke, and disregard of health and safety warnings.[38] *Id.* at 933.

In a subsequent decision of the Court of Appeals, sixteen hospitals brought an action against tobacco companies for violations of antitrust and civil RICO statutes, seeking to recover unreimbursed health costs provided to non-paying patients suffering from tobacco-related illnesses. *AGH v. Philip Morris Inc.,* 228 F.3d at 432. The hospitals alleged the tobacco companies conspired to deceive and mislead the public about the addictive properties of nicotine and the health risks of smoking. Consequently, it was alleged that many persons used tobacco and developed lung cancer and other tobacco-related illnesses. 228 F.3d at 432-33. Some of the persons who became inflicted with the tobacco-related illnesses were medically indigent and could not afford health care, *i.e.,* "the

---

[37]The Court of Appeals in *Steamfitters* identified five alleged links in the causal chain: "(1) the tobacco companies engaged in a conspiracy to suppress information and withhold products from the market; (2) the Funds were prevented from informing their members about the dangers of smoking and the availability of less dangerous products; (3) smokers continued to smoke dangerous tobacco products that they would not have otherwise used (or would have used less); (4) smokers contracted more smoking-related illnesses; and, finally, (5) the Funds suffered increased expenses due to their reimbursement of smokers' health care costs." 171 F.3d at 930.

[38]The Court of Appeals further noted the funds' claims raised concerns about apportioning damages which weighed against RICO standing, while the third prong of the proximate cause analysis–whether another party could better vindicate the RICO claims–was not fully applicable. However, the Court of Appeals held its finding as to the third factor did not outweigh its concerns regarding the remoteness of injury and apportionment of damages. 171 F.3d at 933-34.

non-paying patients," and the burden of treating these patients fell on the hospitals.  *Id.* at 433-34.
The hospitals further contended that the tobacco companies intended to shift the costs of diagnosing
and treating tobacco-related illnesses of the non-paying patients to them and therefore advanced two
theories of injury: one direct–the tobacco companies' wrongful acts increased the unreimbursed costs
the hospital incurred; and one indirect–the tobacco companies' wrongful acts hampered the
hospitals' efforts to reduce tobacco consumption among the non-paying patients through effective
counseling, thereby preventing the hospitals from reducing health care costs of treating tobacco-
related illnesses.  *Id.* at 434.  Based on its reasoning in *Steamfitters,* the Court of Appeals in *AGH*
concluded that the hospitals' claimed injuries were remote and indirect, and much uncertainty and
speculation existed as to what would have happened to the hospitals had the tobacco companies not
conspired.  *Id.* at 443-44 (citing *Steamfitters,* 171 F.3d at 933) (other citation omitted).  The fact that
the hospitals had a duty to provide medical care and did in fact provide direct or free medical care
had no effect on the Court of Appeals' conclusion as to the lack of proximate cause.

　　　　With regard to the other two factors of the proximate cause analysis, even though the Court
of Appeals found the problems of apportionment were not significant and the hospitals may be the
best parties to vindicate the RICO claims, the Court of Appeals in *AGH* nonetheless held that the
remoteness of the hospitals' alleged injuries from any wrongful conduct by the tobacco companies
outweighed the other factors and therefore led it to conclude that proximate cause did not exist.
Accordingly, the Court of Appeals held the hospitals lacked standing to maintain a civil RICO claim.
*Id.* at 444 (citing *Steamfitters,* 171 F.3d at 933-34).

　　　　Finally, in *Anderson, supra,* plaintiffs were loyalist members of the local teamsters union
("local") whose opposition to the president of the International Brotherhood of Teamsters ("IBT")

48

allegedly cost them their jobs at a company who employed union workers. Some of the defendants, consisting of other members of the local, were alleged to have committed wire fraud by making false accusations against plaintiffs during telephone conferences with an IBT investigator which accusations were included in a report to the IBT. This report was in turn relied upon by the president of the IBT (also a defendant) in imposing an emergency trusteeship of the local, which in turn was relied on by plaintiffs' employer in terminating their employment. 396 F.3d at 267-68. The Court of Appeals found the Supreme Court's decision in *Beck v. Prupis,* 529 U.S. 494 (2000), as well as its decision in *Steamfitters,* provided factually analogous precedent on the issue of whether the alleged complex pattern of racketeering activities proximately caused plaintiffs' termination. *Id.* at 270. The Court of Appeals in *Anderson* noted that *Beck* involved a less attenuated chain of causation than the one alleged there and yet the Supreme Court found proximate cause to be lacking.[39] *Id.* The *Anderson* Court was therefore satisfied that the district court was justified in relying on *Beck* to dismiss plaintiff's civil RICO claim. *Id.* The Court of Appeals in *Anderson* found support for its decision in its proximate cause analysis in *Steamfitters,* 171 F.3d at 924. Applying the six factors in *Steamfitters* to the facts of that case, the Court of Appeals found the causal connection between the alleged wrongful conduct (wire fraud) and the harm to plaintiffs (termination of employment) was attenuated because several independent causes, *i.e.,* the report to the IBT, the imposition of the

---

[39]In *Beck,* plaintiff was the president of an insurance company who discovered some of the company's officers and directors were engaged in a financial fraud and reported it to the insurance regulators. In response, the conspiring officers and directors hired a consultant to write a false report suggesting the president failed to adequately perform his duties, and the board of directors terminated the president based on the fabricated report. 529 U.S. 494, 498 (2000). The plaintiff in *Beck,* like the plaintiffs in *Anderson,* alleged only one overt act that directly harmed him–his termination. Despite the fact that the defendants in *Beck* controlled the board of directors that terminated the plaintiff-president, and their falsified report was directly relied upon by the board of directors in terminating plaintiff, the Supreme Court nonetheless concluded that proximate cause was lacking because the alleged overt act–his termination–was not a direct act of racketeering under Section 1962(a) - (c), which is required for RICO standing. 529 U.S. at 507. *Beck* is also discussed in Part 4.b, *infra,* in conjunction with the Court's analysis of Plaintiff's RICO conspiracy claim.

trusteeship, employer's own decision to terminate plaintiffs, intervened between the two. *Id.* at 270-71. The Court of Appeals further found that the alleged wire fraud was intended to attack someone other than plaintiffs and therefore specific intent to harm plaintiffs was minimally indicated; the nature of plaintiffs' injury–job termination–was not the type of injury that normally creates RICO standing; the injury was "extremely indirect"; the extent to which plaintiffs' termination was due to intervening factors as opposed to the alleged RICO acts would be difficult to ascertain; and although little danger of duplicate recovery existed, a significant danger of duplicate *litigation* was present as the RICO lawsuit appeared to be an attempt to relitigate the trusteeship dispute previously ruled upon in an earlier lawsuit. *Id.* (citations omitted).

Applying the above Supreme Court and Third Circuit precedent on proximate cause to the facts of this case, the Court concludes that Plaintiff's alleged injuries are too remote from the alleged wrongdoing by Defendants to establish the requisite proximate cause for RICO standing. While not quite as attenuated as the chain of causation in *Steamfitters* and *Anderson*, the present case presents a chain of causation that is at least as indirect as, if not greater than, that found in *Holmes, Anza,* and *Beck,* in which the Supreme Court held the injury was too remote to establish proximate cause. Here the alleged racketeering conduct consisted of conducting  fraudulent DMEs, distorting the results of the DMEs, and conversion of Plaintiff's PMI, and the alleged harm or injury to Plaintiff was denial of his statutory right to WCOD and disability retirement benefits.  In between these two ends of the causation chain, are the following links: (1) Defendants conducted research studies at the University of Michigan on the effects of exposure to chemical solvents in the workplace and allegedly incorporated Plaintiff's distorted PMI in these studies; (2) Defendants then published two articles in the JOEM incorporating the data from the research studies; (3) Defendants testified at the

workers' compensation proceedings regarding the JOEM articles they published (as well as regarding their examinations of Plaintiff and clinical findings); (4) the WC-ALJ issued his decision denying Plaintiff's claim for benefits and allegedly relied solely on Defendants' testimony in that proceeding regarding the JOEM articles; and (5) the Pennsylvania Commonwealth Court affirmed the WC-ALJ's decision, and the Pennsylvania Supreme Court denied his petition for allocatur.  Thus, Plaintiff has alleged at least five intervening links between the alleged racketeering acts and alleged harm, which clearly demonstrates that Plaintiff's claimed injury is indirect and remote.[40]

Moreover, Plaintiff's argument that the WC-ALJ would not have denied his claim for WCOD benefits if Defendants had not published the JOEM articles which incorporated data from the research studies, which allegedly included his distorted DME results, is simply too speculative given the existence of several independent causes for the denial of WCOD benefits, to wit: (1) Plaintiff's history of depression predating his exposure to chemical solvents; (2) WC-ALJ relied on other evidence in the record besides the JOEM articles;[41] and (3) Plaintiff's PMI was not included in the research studies or JOEM articles.  If Plaintiff was allowed to proceed with his civil RICO claim, the Court would be required to determine the extent to which Plaintiff's injury was due to Defendants' alleged racketeering activities as opposed to these independent causes.  Thus, as in *Steamfitters*, the Court finds the "tortured path" Plaintiff asks it to follow from Defendants' alleged

---

[40]Plaintiff alleges the following overt acts by Defendants:  (1) conducting fraudulent DMEs; (2) distorting the results of the DMEs; (3) conversion of and interference with Plaintiff's and TSE-Claimants' PMI which allegedly constitutes a violation of HIPAA; (4) publication of studies in JOEM which included Plaintiff's PMI; and (5) testifying at workers' compensation proceedings.  None of these acts, however, directly harmed Plaintiff.  Arguably, the only act that directly harmed Plaintiff was the denial of his claims for WCOD and disability retirement benefits.  However, this harm was not directly caused by Defendants, but rather, caused by the WC-ALJ and appellate courts.  Moreover, the denial of WCOD benefits is not a direct act of racketeering activity under Sections 1961 and 1962.  Thus, Plaintiff cannot establish the direct causal connection required for proximate cause.

[41]*See* note 22, *supra.*

wrongdoing to the denial of his statutory right to benefits, demonstrates that Plaintiff's claims "are precisely the type of indirect claims that the proximate cause requirement is intended to weed out." 171 F.3d at 930.

In addition, although duplicate recovery is not implicated here (due to the denial of Plaintiff's claims for WCOD and disability retirement benefits), a significant risk of duplicate *litigation* does exist, as Plaintiff's civil RICO claim appears to be an attempt to relitigate his claim for WCOD benefits which was denied by WC-ALJ and affirmed by the appellate courts.  As to whether another party could better vindicate the RICO claim, there does not appear to be any person who could bring a viable civil RICO claim on these facts, and therefore, there is no civil RICO claim left to vindicate. Although Plaintiff may have been the best party to bring suit to vindicate his personal injury claims asserted here, he has already had an opportunity to litigate those claims in other litigation.

Therefore, it appears that all three factors of the proximate cause analysis weigh heavily against finding proximate cause in this case.  Accordingly, Plaintiff lacks standing to bring a civil RICO claim.

Morever, the issue of proximate cause was already litigated in the workers' compensation proceedings and therefore, arguably, Plaintiff is collaterally estopped from relitigating that issue here. There is no doubt in this Court's mind that Plaintiff's civil RICO claim is yet another attempt to circumvent the decisions of the WC-ALJ and appellate tribunals.

Therefore, for all of the reasons delineated above, the Court recommends that Plaintiff's RICO claim (Count VI) be dismissed with prejudice.

### b.    Conspiracy to Violate Sections 1962 & 1964(c) of RICO (Count V)

Section 1962(d) provides that "[i]t shall be unlawful for any  person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."  The combined effect of Section 1964(c) and Section 1962(d) requires a plaintiff to allege and prove that he has been injured by reason of a conspiracy to violate any of the provisions of Section 1962(a)-(c).  *Beck v. Prupis*, 529 U.S. 494, 500 (2000).  In other words, to state a cause of action for a RICO conspiracy, the alleged overt act that caused the plaintiff's injury must be an act of racketeering or otherwise wrongful under Section 1962.  *Id.* at 505.  In *Beck,* the Supreme Court held that "an injury caused by an overt act that is not an act of racketeering or otherwise wrongful under RICO [(sections 1962(a)-(c))] is not sufficient to give rise to a cause of action under § 1964(c) for a violation of § 1962(d)."  *Id.* at 507. In reaching this conclusion, the Supreme Court determined that Congress intended to adopt common law civil conspiracy principles when it established a civil cause of action in RICO for a person injured by reason of a conspiracy.  *Id.* at 504.  Just as a plaintiff alleging a common law civil conspiracy claim must allege injury from a tortious act, so too, the Supreme Court concluded, must a RICO conspiracy plaintiff allege an act that is independently wrongful under RICO.  *Id.* at 505-06. In *Beck*, the overt act that allegedly caused injury to the plaintiff, who was the former president, director and shareholder of the insurance company, was his termination by the board of directors for a "substantial failure to perform his material duties," which failure was fabricated by certain directors and officers of the insurance company.  *Id.* at 498.  Because his termination by the board of directors was not independently wrongful under RICO, the Supreme Court found plaintiff could not establish that he was injured by reason of a conspiracy.  Accordingly, the Supreme Court affirmed dismissal

of plaintiff's RICO claim for violation of Section 1962(d).

In the case at bar, Plaintiff does not allege *any* injuries by reason of the conspiracy, let alone injuries caused by an act of racketeering.  (TAC ¶¶ 94-98.)  Rather, Plaintiff alleges merely that Defendants conspired to violate Sections 1962 and 1964(c) by "agree[ing] with ROICO to conduct fraudulent DMEs for the criminal conversion of TSE-claimants' and Plaintiff's PMI in violation of 42 U.S.C. § 1320d-6(a) (HIPAA Section 1177)," and that said agreement "comprehended more than two incidents of criminal conversion" and "was their direct participation in the ROICO-enterprise's conduct of a systematic, interstate, criminal racketeering activity."  (TAC ¶¶ 94-97.)  Thus, Count V of the Third Amended Complaint, which fails to state any injuries caused by the conspiracy or a recognized act of racketeering to which said injury may be attributed, is fatally deficient.  Therefore, Plaintiff lacks standing under Section 1964(c) to bring a claim for RICO conspiracy under Section 1962(d).

Plaintiff's conspiracy claim fails for another reason.  As explained above, Plaintiff has failed to state a claim for violations of RICO Section 1962(c), and therefore, so too must his claim for conspiracy to violate RICO fail.  *See Baglio v. Baska,* 940 F.Supp. 819, 836 (W.D.Pa. 1996), *aff'd* 116 F.3d 467 (3d Cir. 1997) (quoting *Lightning Lube, Inc. v. Witco Corp.,* 4 F.3d 1153, 1191 (3d Cir. 1993)) ("'Any claim under section 1962(d) based on a conspiracy to violate the other subsections of section 1962 necessarily must fail if the substantive claims are themselves deficient.'") (other citation omitted). Accordingly, the Court recommends that Plaintiff's RICO conspiracy claim, Count V, be dismissed with prejudice.

54

### III.    <u>CONCLUSION</u>

For the reasons set forth above, it is recommended that Defendants' Joint Motion to Dismiss Plaintiff's Third Amended Complaint be granted with prejudice.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.1.4(B) of the Local Rules for Magistrate Judges, the parties are allowed ten (10) days from the date of service of a copy of this Report and Recommendation to file objections to this Report and Recommendation.  Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto.  Failure to file timely objections may constitute a waiver of any appellate rights.

Dated: August 1, 2006                              BY THE COURT:


                                                   __s/Lisa Pupo Lenihan_____
                                                   LISA PUPO LENIHAN
                                                   U.S. MAGISTRATE JUDGE

cc:     Honorable David S. Cercone
        United States District Court

        All Counsel of Record *Via Electronic Mail*

55